# No. II.

GEORGE HOLMES, PLAINTIFF IN ERROR *vs.* SILAS H. JENNISON, GOVERNOR OF THE
STATE OF VERMONT, AND JOHN STARKWEATHER, SHERIFF OF THE COUNTY OF
WASHINGTON, IN THE SAID STATE OF VERMONT, AND THEIR SUCCESSORS IN OFFICE,
DEFENDANTS IN ERROR.

Opinion of Mr. Justice BALDWIN.

Concurring most fully and cordially in the opinions delivered by those of my
brethren, who are opposed to any action by this Court on this case, I have nothing
to add to the reasons assigned by them respectively, lest it might imply my want of
confidence in the grounds which they have taken; and in my mind maintained with
conclusive force. There are, however, two subjects of high consideration involved
in this case, which I feel constrained to notice; as my opinion would have been
governed by them had there been no other grounds for my declining to interfere
with the order of the Supreme Court of Vermont, remanding the relator to the
custody, whence he was brought before them by the writ of habeas corpus.

1. The Constitution of the United States confers no power on any department
of the federal government, to prevent a state or its officers from sending out of its
territory a person in the situation of Holmes the relator.

2. That a writ of error does lie from this to a state Court, to revise their proceed-
ings on a writ of habeas corpus.

That the treaty-making power of the Constitution, is competent to bind the states
by a stipulation to surrender fugitives from justice, is not denied by any; nor that
where such power is executed by a treaty, a state is under an obligation to surren-
der: but that while such power remains dormant or contingent, the obligation does
not exist, and that Congress have no power to impose it, has been too clearly
established by my brethren, to leave it in my power to add to the weight of their
reasoning. But while I admit the competency of the treaty-making power to com-
pel, I utterly deny its power to prevent the expulsion of a fugitive from justice from
the territory of a state, pursuant to its laws, or the general authority vested in its
executive or other appropriate officers, to administer and enforce its regulations of
internal police.

This distinction between the power to compel, and the power to prevent the sur-
render of a fugitive, is visible in the whole frame of the Constitution, as well in
the general lines which it designates, in separating the powers of the federal and
state governments, by grants, prohibitions, and separations, as by its more specific
provisions.

There cannot be found a clause in the whole instrument, which in terms or by
any fair construction, can be made to bring the power to compel a state not to sur-
render, within any enumerated subject over which Congress can legislate; unless
it is sought as one of a vagrant nature, to be exercised under such of the various
items specified, as may be suggested by a train of ingenious, refined, and subtle
reasoning, from one implication to another, till there is found some hook whereby
to connect this with some granted power. Nay, it is cautiously omitted in the pro-
hibition on the states, to use any language, which can be tortured into a reference
to the subject matter; and as the nature of the treaty-making power precludes any
enumeration of the subjects of its exercise, it is left with no other prescribed limita-
tion, than, that treaties to have their constitutional effect, must be made "under the
authority of the United States." This power must then be called into action, and

act on the subject, before a state can be deprived of the right to surrender, or retain a fugitive at its pleasure ; a right which each state possessed in its plenitude, on the dissolution of the articles of confederacy, and which remained unimpaired, till it became party to the Constitution, on its adoption by the people thereof, whereby they held the power subject to such restraints, as treaty stipulations might impose in future. Without such stipulation the whole subject matter of fugitives of any description, from a foreign nation, or any of its colonies or dependencies, is reserved to the respective states, as fully as before the Constitution; but, with such stipulation in a treaty, I admit the state is as much bound to make the surrender, as if it had been a subject of express delegation of power to the President and Senate; or as if the same provision had been made in relation to foreign fugitives from justice, or service, as those from the respective states, but which is guardedly omitted.

, In the second clause of the second section of the fourth article, the Constitution provides, that " A person charged in any state with treason, felony, or other crime, who shall flee from justice and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state from which he fled." A corresponding provision is made for fugitives from service or labour; and Congress, by the act of 1793, have prescribed the mode in which the provision of the Constitution shall be carried into effect. 1 Story, 284, 285.

It will not be pretended that these provisions do not impose upon the states of this Union, an obligation as imperative, and impair their reserved rights to the same extent, as a similar stipulation in a treaty between the United States and any foreign state; let it then be assumed that there was such a treaty with Great Britain, in relation to fugitives from justice in Canada; and a stronger case cannot be supposed; the question it involves is not difficult of solution.

The object and great purpose of the Constitution and Congress, in one case, and of the treaty in the other, is to make it the duty of the state and its officers to make the surrender on a demand ; but it does not follow that it may not be done voluntarily or without demand ; to take the fugitive to the border and force him to pass the line, whether the authorities of the adjacent states or provinces are desirous, or even willing to receive him or not, is but an ordinary police power. This is the true point in issue ; whether a state is prohibited by the Constitution, from doing of its own accord, an act which it is bound to do, whenever demanded pursuant to a law or a treaty of the United States; and which it might do or refuse, if the subject was neither within the law or treaty-making power of the United States. Had no provision been made for the reclamation of fugitives from the states, there could be no pretence for denying to the states an unlimited discretion over the whole subject ; the Constitution has put one single limitation on this discretion, in case of a demand from the executive of another state ; leaving that discretion as free and full where no demand is made, as if the Constitution had been wholly silent on the subject. And if it had been so silent, the only difference would have been, that though there would have been no obligation to surrender on a demand, there would have been the same right and power to do it, as now exists in each state in respect to their respective fugitives ; or as would. exist under a treaty-making provision for the reciprocal delivery of fugitives from the Canadas, or the states.

. No injunction of the Constitution can be violated, nor the faith of treaties impaired, by each state or province refusing to be made a Botany Bay, an asylum or even the receptacle of the vagabonds, the criminals, or convicts of the other; any duty of state to state, of state to the Union, and the United States to foreign powers; is fully and faithfully executed by the performance of the duties and stipulations imposed or made. But no political community, no municipal corporation, can be under any obligation to suffer a moral pestilence to pollute its air, or contagion, of the most corrupting and demoralizing influence, to spread among its citizens, by the

conduct and example of men, who, having forfeited the protection of their own government by their crimes, claim to be rescued from the consequences, by an appeal to the same Constitution and laws, under which our own citizens are not, and cannot be screened from punishment, when it is merited by their conduct. No state can be compelled to admit, retain, or support foreign paupers, or those from another state; they may be removed or sent where they came; not because poverty is a crime, but because it is a misfortune not to be mitigated or relieved by the compulsory contributions of those among whom they throw themselves, or are cast by their governments for maintenance.

Every state has acknowledged power to pass, and enforce quarantine, health, and inspection laws, to prevent the introduction of disease, pestilence, or unwholesome provisions; such laws interfere with no powers of Congress or treaty stipulations; they relate to internal police, and are subjects of domestic regulation within each state, over which no authority can be exercised by any power under the Constitution, save by requiring the consent of Congress to the imposition of duties on exports and imports, and their payment into the treasury of the United States. 11 Pet. 102. 130, &c. 9 Wheat. 203, &c. 12 Wheat. 436, &c. Vide section 10, article 1, clause 2. "These laws form a portion of that immense mass of legislation, which embraces every thing within the territory of a state, not surrendered to the general government," &c. 9 Wheat. 203. "No direct general power over these subjects is granted to Congress, and consequently they remain subject to state legislation. Ib. "The constitutionality of such laws, has never, so far as we have been informed, been denied," (Ib. 205;) and are considered as flowing from the acknowledged power of a state, to provide for the health of its citizens." Ib.

"The power to direct the removal of gunpowder, is a branch of the police power, which unquestionably remains with the states." 12 Wheat. 443. "We are not sure that this may not be classed among inspection laws. The removal or destruction of infectious or unsound articles, is undoubtedly an exercise of that power; and forms an express exception to the prohibition we are considering. Indeed, the laws of the United States expressly sanction the health laws of a state." Ib. 444. These principles were reaffirmed in the city of New York vs. Miln, in language worthy of repetition, and most appropriate to this case in all its bearings.

"That the state of New York possessed power to pass this law (respecting foreign paupers) before the adoption of the Constitution of the United States, might probably be taken as a truism, without the necessity of proof. But as it may tend to present it in a clearer point of view, we will quote a few passages from a standard writer upon public law, showing the origin and character of this power."

Vattel, book 2, chap. 7, sect. 94. "The sovereign may forbid the entrance of his territory, either to foreigners in general, or in particular cases, or to certain persons, or for certain particular purposes; according as he may think it advantageous to the state."

Vattel, book 2, chap. 8, sec. 100. "Since the lord of the territory, may, whenever he thinks proper, forbid its being entered; he has, no doubt, a power to annex what conditions he pleases, to the permission to enter."

"The power then of New York to pass this law, having undeniably existed at the formation of the Constitution, the simple inquiry is, whether by that instrument it was taken from the state, and granted to Congress; for if it were not, it yet remains with them."

"If, as we think, it be a regulation, not of commerce, but of police; then it is not taken from the states. To decide this, let us examine its purpose, the end to be attained; and the means of its attainment."

"It is apparent, from the whole scope of the law, that the object of the legislature was to prevent New York from being burdened by an influx of persons brought thither in ships, either from foreign countries, or from any other of the

states; and for that purpose, a report was required of the names, places of birth, &c., of all passengers; that the necessary steps might be taken by the city authorities; to prevent them from becoming chargeable as paupers."

"The power reserved to the several states, will extend to all the objects which in the ordinary course of affairs, concern the liberties, lives, and properties of the people; and the internal order, improvement, and prosperity of the state." 11 Pet. 132, 133.

After a review of Gibbons *vs.* Ogden, and Brown *vs.* Maryland; and showing that their opinion is not in collision with the principles of either of those cases; the Court say:—"But we do not place our opinion on this ground. We choose rather to plant ourselves on what we consider an impregnable position. They are these,—That a state has the same undeniable, and unlimited jurisdiction, over all persons and things within its territorial limits, as any foreign nation; where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That by virtue of this, it is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness, and prosperity of its people; and to provide for its general welfare, by any and every act of legislation which it may deem conducive to these ends; where the power over the particular subject, or the manner of its exercise, is not surrendered or restrained in the manner just stated. That all those powers which relate to merely municipal regulations, or what may, perhaps, more properly be called 'internal police,' are not thus surrendered or restrained; and that consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive." 11 Pet. 139.

"We think it as competent, and as necessary for a state to provide precautionary measures against the moral pestilence of paupers, vagabonds, and possibly convicts; as it is to guard against the physical pestilence, which may arise from unsound and infectious articles imported; or from a ship, the crew of which may be labouring under an infectious disease." Ib. 143.

These principles were not declared for the first time in the case of Miln; they flowed from those which were established as unquestionable in the United States *vs.* Bevans, where this language is used:—

"What then is the extent of jurisdiction which a state possesses?

"We answer without hesitation, the jurisdiction of a state is coextensive with its territory; coextensive with its legislative power.

"The place described, is unquestionably within the original territory of Massachusetts. It is then within the jurisdiction of Massachusetts; unless that jurisdiction has been ceded to the United States, (3 Wheat. 386, 387,) by a cession of territory; or, which is essentially the same, of general jurisdiction." Ib. 388.

"It is not questioned, that whatever may be necessary to the full and unlimited exercise of admiralty and maritime jurisdiction is in the government of the Union. Congress may pass all laws which are necessary and proper for giving the most complete effect to this power. Still the general jurisdiction over the place, subject to this grant of power, adheres to the territory as a portion of sovereignty not yet given away. The residuary powers of legislation are still in Massachusetts. Suppose, for example, the power of regulating trade had not been given to the general government. Would this extension of the judicial power to all cases of admiralty and maritime jurisdiction, have divested Massachusetts of the power to regulate the trade of her bay?" Ib. 389.

It would be at least superfluous, if not presumptuous in me, to attempt to illustrate or enforce the soundness of these principles, which this Court declare to be impregnable positions, on which they plant their opinion. That they may neither be shaken or impaired by any future collision between them, and any opinions which may be founded on a contrary construction of the Constitution; is most ardently to be desired, by all who wish to see the federal and state governments move within their respective orbits, with the same harmony for the future,

as they have done for the past. The continuance of this harmony, will, in my opinion, be in imminent danger, not only of interruption, but of extinction; whenever the course of this Court shall be such, as to subvert the great principles of constitutional jurisprudence, on which it has defined the line of separation between the powers which are granted to the United States, and those prohibited or reserved to the states, or the people thereof respectively. Nor is there one among these latter powers, which, it is so dangerous to attempt to impair, as that of internal police; and especially that portion of it which relates to fugitives, vagabonds, criminals, or convicts, whether they have fled from justice before, or after trial: for if a state cannot expel from her territory this species of pestilence, so infectious, contagious, and fatal to the morals of the community, in which they are suffered to mix and move unmolested; her power of police is a shadow, a farce, while this most feculent mass of corruption remains a public nuisance, which the power of a state is incompetent to abate.

It is but a poor and meagre remnant of the once sovereign power of the states, a miserable shred and patch of independence, which the Constitution has not taken from them, if in the regulation of its internal police, state sovereignty has become so shorn of authority, as to be competent only to exclude paupers, who may be a burden on the pockets of its citizens; unsound, infectious articles, or diseases, which may affect their bodily health; and utterly powerless to exclude those moral ulcers on the body political, which corrupt it ·vitals, and demoralize its members. If there is any one subject, on which this Court should abstain from any course of reasoning, tending to expand the granted powers of the Constitution, so as to bring internal police within the law or treaty-making power of the United States, by including it within the prohibition on the states, it is the one now before us. Nay, if such construction is not unavoidable, it ought not to be given: lest we introduce into the Constitution a more vital and pestilential disease than any principle on which the relator could be rescued from the police power of Vermont, would fasten on its institutions, dangerous as it might be, or injurious its effects. Should an adjudication so fearful in its consequences, be made in a case of a kindred nature with this, the people and states of this Union will "plant themselves" on the "impregnable positions," taken in the opinions of this Court, in the cases quoted; and standing on grounds thus consecrated, refuse to surrender those rights which we had declared to be "complete, unqualified, and exclusive."

The power of this Court is moral, not physical; it operates by its influence, by public confidence in the soundness and uniformity of the principles on which it acts; not by its mere authority as a tribunal, from which there is no appeal; and if ever its solemn decisions should be overlooked by itself, or we should cease to respect those of our predecessors, the people and the states will still adhere to them; and our successors will refuse to follow our deviations from the ancient path. It may be the doctrine of the day, that the reserved rights of the states are too broad, and the powers of Congress too narrow; but it will not withstand the scrutiny of time, or the deliberate consideration of the principles on which the cases referred to have been decided, and those therein promulgated. If they shall ever be disregarded in public opinion, and their reversal follow; it will not be done by the establishment of those principles on which it is now attempted to enlarge the prohibitions on the states, and to expand the powers of Congress, by implication upon implication, to effect both objects by ingenious or far-fetched suppositions or assumptions. Ingenuity, talents, and subtlety, can work a countermine under the Constitution, by which the contrary effect may be produced; whereby the reserved powers of the states may absorb as much of the granted powers of the general government, as the adoption of the grounds on which the relator's case has been placed would take from those which have neither been granted by, or prohibited to the states. Equally dreading and avoiding both extremes, I am content to take the Constitution as it has hitherto been expounded by this Court, on all subjects connected with the

cause now before us; in my opinion it leaves no open point, even admitting what is known not to exist, that there was a treaty stipulation on the subject. But without such stipulation, the relator's case is most bald and barren of merits; it rests upon doctrines not to be sanctioned consistently with past adjudications, which, in the United States *vs.* Bevans, asserted the jurisdiction and legislative power of a state to be coextensive with its territory, over all subjects not delegated to the general government; and in Gibbons *vs.* Ogden, Brown *vs.* Maryland, and New York *vs.* Miln, declared that no power over the internal police of a state had been so delegated by the Constitution; but was reserved exclusively to the states. I deem it wholly unnecessary to make a detailed application of those cases to the present; their 'affinity is too visible on a comparison, to require any thing more than a reference to them respectively, as they are reported; police is in every feature; the moral and physical health of the people is the common object of police regulations in all their ramifications, as applied to the vast variety of subjects which they embrace, and none of which are confided to any other than state power; and all of which must remain under its exclusive control, till the Constitution is changed.

The states are enjoined by the Constitution, to surrender a fugitive from another state on a demand; they will be obliged to do it under a treaty stipulation to a foreign power; and thus far, but no farther, has there been, or can be any abridgment of their power over the subject: they cannot be deprived of their right of expelling from their territory those fugitives who have no privileges within it; or be compelled to retain them, when they are not entitled to the protection of its Constitution or laws. Any refugee crosses the border at his peril; his government may not desire to reclaim him for punishment, and be unwilling to receive him again; but that matters not to the state to which he flies; the right and power to remove, expel, and voluntarily to surrender the fugitive, is as perfect as if it was a duty prescribed by a power paramount to that of the state.

This is, in my opinion, the turning point of this case; and this right to determine what persons fleeing from abroad shall be suffered to remain a burden on its citizens for their support, or a dangerous example to the community, is so peculiarly and appropriately a subject of state jurisdiction, as to be incapable of delegation to any other power. Any action of Congress upon it, would be not only an assumption of ungranted power, but a direct usurpation of powers reserved to the states; and if exercised by means of coercion, to compel a state to retain the vagabonds from other states, or the border provinces, would operate more fatally on the morals of the people, than pestilence upon their health, or gunpowder on their property, and their lives. Happily, such power is not visible in the Constitution; nor has it been infused into it by construction; whenever internal police is the object, the power is excepted from every grant, and reserved to the states, in whom it remains in as full and unimpaired sovereignty as their soil, which has not been granted to individuals, or ceded to the United States; as a right of jurisdiction over the land and waters of a state, it adheres to both, so as to be impracticable of exercise, by any other power, without cession or usurpation. Such is the power which the governor, as chief magistrate of Vermont, has exercised over this fugitive; in my opinion, it was properly exercised; and that no department of this government is competent, on subjects of police, to control him, or any other state officer, in the execution of his or their offices.

By the course which has been taken, all danger of interfering with the relations of the United States and foreign powers, either on matters of commercial intercourse, or diplomatic concern is avoided; such interference could happen only on the refusal to deliver up the fugitive, on the demand or request of the authorities of Canada; for a compliance with either, would rather add strength to, than tend to weaken the pre-existing relations of amity and comity between the two nations. On the other hand, if the delivery was spontaneous, and made in the true spirit of border peace, and mutual safety from crime, the boon would be the more accept-

able; or if the authorities of the state should send the fugitive back whence he came, those of Canada would have no cause of complaint, because they had made no reclamation, or because Vermont was unwilling to incorporate among its citizens a foreigner whom his own government was disposed not to take back. The United States cannot complain, for, neither their rights or power can be affected, unless some department of their government shall put itself in the place of Vermont, to determine on what subject its internal system of police shall operate, and how it shall be executed ; but on any other ground or pretext, there can be no colourable argument or reason for such interference. That the case before us is one in any way affecting our foreign relations, seems to me wholly supposititious; and the untoward consequences which seem to be apprehended from affirming the exercise of the power of the governor, appear as wholly conjectural, and without any rational foundation in fact or principle. But be this as it may, we have no warrant from the Constitution, and Congress can give us none, to authorize us to interfere with the exercise of a power, which comes within every definition which this Court has given of a regulation of the internal police of a state; or to examine whether it has been exerted under the authority of a state law, or by the constitutional power of its chief executive magistrate. It suffices for all the purposes of this case, that the subject matter is not of federal cognisance ; but is excluded from the jurisdiction of the United States to its full extent, and reserved for the action of another sovereignty, whose power over it must remain untouched, till an an endment to the Constitution shall displace it. That this may never be done is, in my opinion, devoutly to be wished by every friend to the permanency of our institutions.

The other ground on which I am opposed to any interference with the proceeding of the Supreme Court of Vermont in this matter is, that it is not within the appellate jurisdiction of this Court, under the twenty-fifth section of the Judiciary Act; because the order of that Court on a habeas corpus, is not a judgment on which a writ of error can be brought.

I cannot so well define the nature and object of the writ of habeas corpus, or so well explain the proceedings upon it, as in the language of this Court:—"It has been demonstrated at the bar, that the question brought forward on a habeas corpus, is always distinct from that which is involved in the cause itself. The question whether the individual shall be imprisoned, is always distinct from the question whether he shall be convicted or acquitted of the charge on which he is to be tried ; and therefore these questions are separated and may be decided in different Courts." ·

"The decision that the individual shall be imprisoned, must always precede the application for a writ of habeas corpus; and this writ must always be for the purpose of revising that decision, and therefore appellate in its nature." 4 Cranch, 101. " This being a mere inquiry, which without deciding upon guilt, precedes the institution of a prosecution, the question to be determined is, whether the accused shal be discharged or held to trial ; and if the latter, in what place they are to be tried, and whether they shall be confined or admitted to bail. If, &c. upon inquiry it manifestly appears, that no such crime has been committed, or that the suspicion entertained of the prisoner was wholly groundless, in such cases only is it lawful totally to discharge him, otherwise he must either be committed to prison, or give bail." Ib. 125, 126.

" The Judicial Act (sect. 14) authorizes this Court, and all the Courts of the United States, and the judges thereof, to issue the writ for the purpose of inquiring into the cause of commitment." 3 Pet. 201. " It is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause." " It is in the nature of a writ of error to examine the legality of the commitment." Ib. 202.

It lies to a Circuit Court of the United States, sitting in a state, (3 Dall. 17,) or to the Circuit Court of this District, (3 Cranch, 448. 4 Cranch, 101,) it is an exercise of appellate jurisdiction, and " we are but revising the effect of their pro-

cess, &c. under which the prisoner is detained." 7 Pet. 573. But it does not lie in favour of persons committed for treason or felony, plainly expressed in the warrant, convicted of a contempt, (9 Wheat. 39,) or of a crime, by a Court of competent jurisdiction, (3 Pet. 202. 208,) or persons in execution, (Ib.;) nor will the Court upon the writ look beyond the judgment, and re-examine the charges on which it was rendered, (Ib. 202;) for if this Court cannot directly revise the judgment of a Circuit Court in a criminal case, they cannot do it indirectly. Ib. 208. The power to issue this writ being concurrent in this Court, the Circuit, and District Courts, and every judge of either, the action upon the writ when the party is before a Court or judge, is directed to the same object, "for the purpose of inquiring into the cause of commitment," in order to ascertain whether he shall be remanded to prison, discharged on bail, or without bail; in doing which this Court has no more power than any district judge; the nature of the power and the rules by which it must be exercised, are the same. 4 Cranch, 96.

This Court has declared this power to be appellate, and not original; so I shall take it on its authority, though if the point was new, it would seem to me to be the exercise of a special authority given by the Judiciary Act, for the specific purpose therein set forth: and that from the very nature of a high prerogative writ, it must be issued, and acted upon by prerogative, and not appellate power; especially by the Courts of the United States, whose jurisdiction is special, and limited to the cases specified in the Constitution and Judiciary Act. Taking however the power to issue the writ, and the action upon it to be appellate, then every district judge can exercise it to the same extent that this or a Circuit Court can; consequently he can revise the process of either Court, by which a person has been committed, by inquiring into the cause of commitment, and proceeding thereupon in the same manner, as if the commitment had been by a justice of the peace. This inquiry is confined to the question of recommitment, or discharge, the result of which depends on the discretion of the judge or Court before whom the prisoner is brought; the warrant of commitment must be inspected to see whether it sets out a proper cause for imprisonment; the evidence is examined for probable cause of prosecution; and if the warrant and evidence are sufficient, then the question of bail and its amount necessarily arises, which is, confessedly, a matter purely discretionary, subject only to the provision of the eighth Amendment to the Constitution, the thirty-third section of the Judiciary Act, (1 Story, 66;) and the fourth section of the act of 1793. 1 Story, 311.

On this view of the nature and object of the writ of habeas corpus, with the proceeding upon it, considered as the exercise of appellate jurisdiction; the first inquiry is, whether the manner in which it has been exercised, can be revised by a writ of error, to any Court or Judge of the United States.

That a writ of error will not lie upon any proceeding before a judge of this Court, or a district judge, in vacation, is too clear for discussion; there is no Court, no record to remove, no judgment to revise, the judge acts by a summary order, which affects only the question of imprisonment, discharge, or bail; the very nature of such action by an appellate power, by a judge out of Court, precludes its revision by another appellate power; which can act only by a writ of error, directed to a Court of record, to remove their final judgment and proceedings in the case. This Court cannot issue a writ of error to a District Court, in any case where a special authority to do it is not expressly given by law; nor to a Circuit Court, unless by the provision of the Judiciary Act, (7 Cranch, 108. 287. 2 Wheat. 259. 395. 6 Pet. 495, 496. 12 Pet. 143. 13 Pet. 290;) nor can the Circuit Court issue a writ of error to a District Court, in any other than the specified cases provided for; " or issue compulsory process to remove a cause before final judgment." Such process (as a certiorari) is void, and may be disregarded (2 Wheat. 225, 226) as a nullity.

By the twenty-second section of the Judiciary Act, final judgments and decrees,

in civil actions in the District Courts, may be re-examined in the Circuit Courts on a writ of error; whereby the power of the Circuit Court rests on two things; the judgment must be final, and must be rendered in a civil action, neither of which can exist in a habeas corpus issued under the fourteenth section; which gives authority to issue and act upon this writ, in two classes of cases. 1. To all the Courts of the United States, where it is necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. 2. To either of the justices of the Supreme Court, as well as judges of the District Court, "for the purpose of an inquiry into the cause of commitment." Provided that writs of habeas corpus shall in no case extend to prisoners in gaol; unless they are in custody under the authority of the United States; committed for trial before some Court of the same, or to testify, &c. 1 Story, 59.

On a full consideration of this section, this Court, in the case of Bollman and Swartwout held, that it applied to the great writ of habeas corpus ad subjiciendum, providing the "means by which this great constitutional privilege should receive life and activity," that the generic term habeas corpus, when used singly and without additions, means the great writ now applied for; "and in that sense it is used in the Constitution." 4 Cranch, 94—100. It was also held, that it did not apply to a habeas corpus ad respondendum, to process from a state Court, to a habeas corpus cum causa, or the mode of bringing causes into a Court of the United States, from a state Court, (Ib. 96. 98;) consequently this great writ issues only in cases where a party is imprisoned on the charge of some criminal offence against the United States; and not in a civil action, to which they may be a party, as is apparent from the view taken by the Court in connecting the thirty-third and fourteenth sections.

The thirty-third section directs, that, "upon all arrests in criminal cases, bail shall be admitted, except where the punishment may be death; in which cases it shall not be admitted, but by the Supreme or a Circuit Court, or by a justice of the Supreme Court, or a judge of a District Court; who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." Vide 1 Story, 66; on which the Court remark:—

"The appropriate process of bringing up a prisoner not committed by the Court itself, to be bailed, is by the writ now applied for; of consequence a Court possessing the power to bail prisoners not committed by itself, may award a writ of habeas corpus for the exercise of that power;" and the thirty-third section was held to be explanatory of the fourteenth. 4 Cranch, 99, 100.

Hence there are, in my opinion, three objections to a writ of error from a Circuit to a District Court, to revise their proceedings on a writ of habeas corpus ad subjiciendum: 1. It is not a civil action. 2. The order to recommit, to bail, or discharge is not a final judgment or decree. 3. The action of the Court is discretionary, depending on the nature of the case, the evidence, and the usages of law. These objections apply with greater force to a writ of error from this to a Circuit Court under the twenty-second section, which provides that "upon a like process, may final judgments and decrees in civil actions, and suits in equity, in a Circuit Court, brought there by original process, or removed there from Courts of the several states, or removed there by appeal from a District Court, be re-examined in the Supreme Court. Independent then of the three objections above mentioned, others arise from the additional provisions in relation to the writ of error from the Supreme Court. It lies only from a final judgment, in a civil action, &c. brought in a Circuit Court by original process, or removed there from a state, or District Court; consequently it lies not upon a proceeding on a habeas corpus; which is the exercise of appellate power, commencing on petition, affidavit, and motion for the writ, and terminating by an order which the Court makes according to its discretion. This order, from its nature and effect, is not and cannot be final; for it only discharges the party from any further confinement, under the process under which he was arrested, " but not

from any other process which may be issued against him, under the same indictment." 9 Pet. 710. The inquiry being merely preliminary to a trial, the order is only interlocutory, and can extend no farther than to the specific subjects of the inquiry, which can have no bearing on the final result of the prosecution, as to guilt or innocence.

By using the term "original process" the law excludes that which is appellate, it relates to the writ, by which a plaintiff brings a defendant into the Circuit Court, to answer a demand made in a civil action for a debt or damages; but surely not to a writ issued for persons in confinement under a criminal charge, directed to the officer or person who has him in custody under the authority of the United States, the object of which is to procure the liberation of the prisoner. The same conclusion results from the reference to civil actions in the Circuit Court, "removed there from Courts of the several states;" these actions are described in the twelfth section, which prescribes the mode of removal, and declares that when removed, "the cause shall proceed in the same manner, as if it had been brought there by original process." So as to civil actions removed there by appeal from a District Court, which are defined in the twenty-first section, and confined to final decrees "in causes of admiralty and maritime jurisdiction;" whence it follows, that the proceeding of the Circuit Court on a writ of habeas corpus, cannot be comprehended within either of the three classes of cases, to which a writ of error is confined by the terms of the twenty-second section of the Judiciary Act.

The provisions of the twenty-third and twenty-fourth sections lead to the same conclusion, by pointing only to those cases in which an execution can issue, or be superseded by the writ of error, and where, upon affirmance, the Court may decree just damages to the respondent in error for his delay, and single or double costs at their discretion; and by directing the mode of proceeding by the Supreme Court on affirming or reversing, and sending a special mandate to the Circuit Court, to award execution thereupon, (Vide 1 Story, 61,) which will be hereafter considered in connection with the twenty-fifth. An application of these provisions to a writ of error on a writ of habeas corpus, makes it manifest that the law contemplated no such case, no execution issues, the order for recommitment or to give bail, or for a discharge, cannot be superseded; no damages can accrue by delay, and no mandate for execution can be awarded, for no final judgment exists on which an execution could issue. Had it been intended to embrace a habeas corpus, some provision appropriate to the case would have been made; its entire omission affords the most conclusive evidence to the contrary; or if any thing is wanting to remove all doubt, it will be found in the nature and object of this great writ, this constitutional privilege. It was designed to afford a speedy remedy to a party unjustly accused of a crime, without obstructing or delaying public justice; both of which objects would be defeated, by the delays consequent upon a writ of error, as it may be taken out by either party; if it can be by one, the Court can make no distinction between them, as it is a writ of right. Vide 7 Wheat. 42. For these reasons I am fully convinced, that no writ of error can be issued by this, or a Circuit Court, under the authority of the Judiciary Act, to revise a proceeding on a writ of habeas corpus, by any judge or Court of the United States: the next inquiry is, whether it can issue on a similar proceeding in a state Court.

By the twenty-fifth section it is provided, "That a final judgment or decree in any suit in the highest Court of law or equity of a state, in which a decision of the suit could be had," &c. (enumerating the particular classes of cases) "may be reexamined, and reversed or affirmed in the Supreme Court of the United States, upon a writ of error," &c. "in the same manner, and under the same regulations, and the writ shall have the same effect, as if the judgment or decree complained of had been rendered or passed in a Circuit Court; and the proceeding upon the reversal shall be the same, except, that the Supreme Court, instead of remanding the cause for a final decision as before provided, may at their discretion, if the

cause has once been remanded before, proceed to a final decision of the same, and award execution." 1 Story, 61, 62. 1 Wheat. 353. This section differs from the twenty-second, only in using the term " any suit," in place of " civil actions," the effect of which is, that the writ of error lies to remove an indictment from a state Court, as held in Cohens *vs.* Virginia. 6 Wheat. 390, 391. 407. 410, &c. and to a pro- hibition, in Weston *vs.* The City, &c. of Charleston, (2 Pet. 463, 464,) but the nature of the judgment to be re-examined is the same, it must be a final one. The twenty- third section applies to the writ of error to a state Court, in all respects as to a . Circuit Court. So does the twenty-fourth, unless so far as its provisions come within the exception of the twenty-fifth, which it becomes necessary to consider. The twenty-fourth section directs, that when a judgment or decree of the Circuit Court shall be reversed by the Supreme Court, it shall proceed to render such judgment, or pass such decree, as the Circuit Court should have rendered or passed ; except when the reversal is in favour of the plaintiff or petitioner in the original suit, and the damages to be assessed or matter to be decreed are uncertain, in which case they shall remand the cause for a final decision. And the Supreme Court shall not issue execution in causes that are removed before them by writs of error, but shall send a special mandate to the Circuit Court to award execution thereupon."

. Connecting this section with the exception in the twenty-fifth, we have the pre- cise case provided for in the latter; " where the damages to be assessed," (in a suit at law,) " or the matter to be decreed," (in a suit in equity,) " are uncertain ;" then the Supreme Court may " proceed to a final decision, and award execution," if the cause had been before remanded. Now it is most evident, that neither the excep- tion in the twenty-fourth or twenty-fifth section, can apply to a proceeding on the writ of habeas corpus, for two conclusive reasons ; 1. That if the reversal is in favour of the petitioner or plaintiff in this writ, there are no damages to be asses- sed, nor any matter to be decreed, which is uncertain ; the judgment to be rendered is certain, and can be none other, than for the discharge of the prisoner, on, or without bail ; and is not, nor can be a final decision of the cause. 2. The original suit is on the warrant of commitment, and a decision which precedes the applica- tion for the writ of habeas corpus, the issuing of which, and the proceeding upon it are, as has been held uniformly by this Court, the exercise of appellate jurisdic- tion and power.

A third reason is equally apparent in both sections, the final judgment must have been one, on which an execution could be awarded by the Circuit Court on a special mandate from this, under the twenty-fourth ; or by this Court, in a case coming within the exception of the twenty-fifth ; and in either case, there must have been a final decision of the cause, before any execution could be awarded.

The terms " original suit," and " cause," are used in the same sense, in the twenty-fourth section, so in the twenty-fifth ; " suit" and " the cause" mean the same thing, both terms referring to the final action of this Court, whether they " remand the cause for a final decision," by the Circuit Court, and send them a special mandate to award execution under the twenty-fourth ; or themselves, " pro- ceed to a final decision of the same, (the cause,) and award execution," under the twenty-fifth section.

These considerations bring this inquiry to a narrow space, presenting to my mind stronger objections to the jurisdiction of this Court over the present case, than would apply to a writ of error to a Court of the United States ; while all the rea- sons which apply in the latter case, operate with full force on this ; unless some distinction can be found between the terms " civil actions," and " any suit," or " the cause ;" in which a final judgment has been rendered, which will justify a writ of error to a state Court, in a case where it would not lie to a Court of the United States, by reason of its not being a final decision or judgment ; or on any other ground than that it was not a civil action. The only distinction between the

two classes of cases, consist singly in this; that the term "any suit," in the twenty-fifth section, is broader than the term "civil actions," &c., in the twenty-second; whereby criminal cases may be revised by this Court, on a writ of error to a state Court; though they are excluded from the appellate jurisdiction of this, over Circuit Courts; unless they are certified by a Circuit Court, on a division of opinion between the judges thereof, under the sixth section of the act of 1802, (2 Story, 856;) if such action as is therein prescribed, can be called the exercise of appellate power, and not a mere special, statutory authority.

In following to its consequences the settled principle of this Court, that in issuing and acting upon a writ of habeas corpus under the fourteenth section, it is by appellate power; it will appear that the reasons for so considering this power, are most conclusive against the exercise of their appellate jurisdiction over writs of error to the proceedings of a state or Circuit Court, on such a writ issued by either. In defining appellate power in such cases, the Court say:—"It is the revision of a decision of an inferior Court, by which a citizen has been committed to jail;" the question on a habeas corpus "is always distinct from that which is involved in the cause itself, (4 Cranch, 100;) these questions are separated, and may be decided by different Courts." "The decision that the individual shall be imprisoned must always precede the application for the writ of habeas corpus; and this writ must always be for the purpose of revising that decision; and therefore appellate in its nature." Ib. 101. The case on a habeas corpus, is "a mere inquiry, &c., whether the accused shall be discharged, or held to bail." Ib. 125. The law which gives authority to issue the writ, defines its object, "for the purpose of inquiring into the cause of commitment," (3 Pet. 201;) "its legality, and the sufficiency of that cause." Ib. 202. "Considering then as we do, that we are but revising the effect of the process awarded by the Circuit Court, under which the prisoner is detained, we cannot say that it is the exercise of an original jurisdiction."

A discharge under this writ, discharges the party only from such process, and not "from any other process under the same indictment," (9 Pet. 710;) or a new one. 4 Cranch, 136.

Let then whatever term, action, case, cause, suit, be given to a writ of habeas corpus, and the proceedings upon it; let the final action of the Court upon it be called a decision, an award, a judgment, or order, the character or nature of either, and the effect are the same; nothing is revised but the process of arrest, and the decision on which the process issued, and the arrest is made; the inquiry is limited to the cause of commitment; and every question arising is always so distinct from "the cause itself," that this inquiry can be determined by one Court, and the cause by another.

There can then be no final decision of "any suit," the "original suit," or "the cause," on a writ of habeas corpus, the subject matter in controversy remains unaffected by the mere inquiry into the cause of commitment, its sufficiency or the legality of the process, as fully as if no habeas corpus had been issued; any judgment rendered by any Court affects only the process; nor can it be in any sense deemed a "final judgment in a suit," on "the cause itself," or "a final decision of the same." So as to make it cognisable in this Court, by any appellate jurisdiction, on a writ of error to a Circuit Court, under the twenty-second, or a state Court, under the twenty-fifth section of the Judiciary Act.

Another objection equally fatal to the writ of error in this case is, that though the awarding the writ of habeas corpus is a matter of right, and "is granted ex debito justitiæ," yet the action of the Court is governed by its sound discretion, exercised on the whole circumstances of the case, according to which "the relief is allowed or refused on a motion." But a rule or order, denying the motion, is not a judgment, "it is only a decision on a collateral, or interlocutory point, which has never

been deemed the foundation of a writ of error," which lies "only upon a final judgment or determination of a cause."   "A very strong case illustrating the doctrine is, that error will not lie to the refusal of a Court to grant a peremptory mandamus," &c., as held by the House of Lords, (Vide 6 Pet. 656, 657;) and cases cited, 9 Pet. 4. 6.   No principle is, or can be better settled by this Court, than that no writ of error lies upon any proceeding in a cause, depending on the discretion of the Court.   1 Pet. 168.   6 Pet. 217. 656.   7 Pet. 149.   13 Pet. 15. There can be no case more peculiarly and exclusively of that description, than one involving only the question of discharge, or recommitment on a habeas corpus; which is declared to be "the appropriate process" for that purpose.   4 Cranch, 100.   "A mere inquiry, without deciding upon guilt," (Ib. 125;) "always distinct from the question, whether he shall be convicted, or acquitted," (Ib. 101;) and directed only to process, (7 Pet. 573.   9 Pet. 710;) not to the final determination of the cause, (6 Pet. 657;) but to a decision on a mere interlocutory, collateral point, cautiously excluded from revision on error, by the Judiciary Act.

The same result is found in "the principles and usages of (the common) law," as laid down in the time of Coke, without a single deviation to this time.   In 8 Co. 127$^b$, 128$^a$, it was declared, that no writ of error could lie upon a habeas corpus; because it was "festinum remedium."   S. P. Strange, 539.   It will not lie upon a writ of procedendo; the refusal of a prohibition, or mandamus for the party, shall not be hung up on error, (Strange, 391. 543;) nor on a judgment quod computet, in account, Quod partitio fiat, in partition, by default in trespass; on awards of inquiry, on awards interlocutory, and not definitive, nor till the "last judgment" is rendered, on "all the matter within the original," the "whole matter of the cause;" because till then, the judgment or award is not final.   11 Co. 38$^b$ —40$^a$.   Vide Com. Dig. Pleader, Error, B.   When an interlocutory judgment or award works a forfeiture, then error lies to be relieved therefrom.   11 Co. 41$^a$. But this is only an exception to a universal rule, that error lies only on a final judgment which determines the whole subject matters in a cause; from which this Court has never yet departed, by any direct adjudication in error under either the twenty-second, or twenty-fifth sections of the Judiciary Act, or on the rules of the common law.

That the course of opinions delivered in this case by the majority, if not all the other judges, is different from mine is apparent; but as no judgment has been rendered by the Court, this point cannot be judicially settled : it is yet open to argument by counsel whenever a similar case arises; and of consequence, remains open for the consideration of this Court, or any of its members, here or elsewhere, as it has hitherto been considered.   My reference to the Judiciary Act and the opinions of this Court, have been more in detail than to the principles of the common law, or the adjudged cases; because the former appeared to me to be conclusive, as to what the law of the land and of the Court has been, is, and ought to be in future. If it admitted of doubt, as to the latter, it sufficed for the case, to show by a brief reference, what the common law has been for centuries, and now is, without ever so far departing from what I deem my judicial duty, as to even inquire what it ought to be; as if it was in my power to abrogate, or vary from its rules on this or any other subject.   When a point is decided by the adjudged cases, or laid down as settled in the books of acknowledged authority; I take it, and feel bound to act upon it, as the common law, which is infused into our jurisprudence; unless some act of Congress, some local law, or some decision of this Court, prescribes another rule. When this Court declare that "we are entirely satisfied to administer the law as we find it," (7 Wheat. 45.   3 Wheat. 209;) I feel bound to endeavour to find, and when found to follow it in all its course; and in searching among the fountains, rather than the rivulets of the law, for its true principle, I have found no safer guide than its forms, which from ancient times have embodied and preserved, unchanged,

those principles which time has consecrated, by the certainty of the law, and the security and reposo which an adherence to its rule affords to the rights of property and person.

Forms of writs, process, proceedings in suits, judgments, and executions, in all their various applications to matters of jurisprudence, were devised of old, and are yet followed, in order to practically apply the rules and principles of the law they enforce upon persons, property, and rights of all description; and when these forms are overlooked, the principles to which they give life, activity, and effect, will be forgotten or disregarded; nor is there a more effectual mode of producing both results, than at this day to look beyond those rules which have prevailed for centuries, and been respected as the land-marks of the law, to the reasons on which they were originally founded, of which this case affords a strong illustration.

It is admitted that in the whole course of the common law, there is no one precedent of a writ of error, upon the proceeding on a writ of habeas corpus; yet it has been earnestly contended at the bar, that error lies in such case on general principles; and that the contrary course of the English Courts has arisen from the mere omission to enter on the proceeding by habeas corpus, the purely technical words, "ideo consideratum est" in the order or award made by the Court.

Had the learned counsel of the relator disclosed to the Court the result of an inquiry, why these (so called) technical words were deemed so important, the reasons would have been found to be most decisive in a case of habeas corpus or mandamus; for before the statute of     no record was made of the proceedings on those writs, no judgment was rendered on them, and consequently there was no record to remove from an inferior to a Superior Court, by a writ of error.

The omission of the term "ideo consideratum est," which is the appropriate and only form known to the common law to denote the judgment of a Court, on a matter of record, in contradistinction to an order or award in granting or refusing a motion; was deemed good evidence that the law did not recognise a decision in which these words were not used, as a final judgment on which a writ of error could be brought; especially when, by the common law, such a decision was not made a matter of record, or so considered. However these reasons may operate on the minds of others, they satisfy mine that they are founded in the best established principles of the common law, and that when they are not found in the forms it has adopted, to denote the action of a Court, on a matter before them, their decision is not a judgment of record, cognisable in error, or in the words of Coke and this Court; " that without a judgment or an award in the nature of a judgment, no writ of error doth lie," (6 Pet. 656;) nor on decisions on motions "addressed to the sound discretion of the Court, and as a summary relief which the Court is not compellable to allow." Ib. 657. The refusal to quash an execution, is not in the sense of the common law, a judgment; much less a final judgment. It is a mere interlocutory order. Even at the common law, error lies only from a final judgment; and by the express provisions of the Judiciary Act, &c., sec. 22, a writ of error lies in this Court only on final judgments. Ib. A writ of error will not lie to a writ of error coram vobis, granted by the Circuit Court to correct its own errors; "it is subject to the same exceptions which have always been sustained in this Court, against revising the interlocutory acts and orders of the inferior Courts." 7 Pet. 147. 1 Pet. 340. "It is not one of those remedies over which the supervising power of this Court is given." Ib. 148. "The writ of error (coram vobis) was but a substitution for a motion in the Court below." Ib. No judgment in the cause is brought up by the writ, but merely a decision on a collateral motion, which may be renewed. 7 Pet. 149. S. P. 9 Wheat. 578, cited. In both cases the writ of error was dismissed, "because it was a case proper for the exercise of that discretion, and not coming within the description of an error in the principal judgment." Ib. Ib. "The decision of the Court upon a rule or motion is not of that character," (a final judgment,) this point which is clear by the words of the (Judiciary) Act,

has been often adjudged by this Court." The cases in 6 Pet. 648, and 9 Pet. 4, are noted with approbation, and their principles reaffirmed. Vide 9 Pet. 602. These are the reasons why a writ of error will not lie at common law, or under the Judiciary Act in such cases, and these, are the general principles of all law, and the foundation of the universal rule; that where power is given to any tribunal, to be exercised at its discretion, whether it is legislative, executive, judicial, or special, the decision of such tribunal is revisible only by some other tribunal, to which a supervisory power is given. 6 Pet. 729, 730. S. P. 7 Cranch, 42, &c. 1 Pet. 340. 2 Pet. 163. 3 Pet. 203. 10 Pet. 472, &c. 12 Pet. 611. The forms and modes of expression, by which any tribunal pronounces its discretion to have been exercised, does not affect the nature or character of its decision; that depends on what it has decided and its effect, whether it is a final judgment, or an interlocutory one, or a mere summary order, direction, or decision, on a rule or motion, which is not in law a judgment, though it may be expressed in the words appropriate to a judgment. The law looks to the thing done, as the true test of whether it is cognisable in error. To make it so, there must be a consideration of the record, on the matter of law, not of discretion; a final judgment of the whole matters of law in the suit, by determining the controversy, and the cause; which by the forms of the common law, always is expressed in the dead language of the old forms of judgment—"Ideo consideratum est," which has exposed this term to the imputation of technicality; but when its sense and meaning is expressed in the living language of this Court, and applied to the varied subjects and modes of its action, a very different character must be attributed to the significant and appropriate terms in which their decision is announced, according to the case before them.

Thus, in awarding the writ of habeas corpus : "The motion is granted," 4 Cranch, 101; or, "On consideration of the petition," &c. "Whereupon it is considered ordered and adjudged, that a writ of habeas corpus be forthwith granted," &c. 7 Pet. 583. So, where the party is discharged : "It is therefore the opinion of the Court," &c., "that there is not sufficient evidence," &c. "to justify his commitment," (Ib. 134,) " and, therefore, as the crime has not been committed," the Court can only direct them to be discharged. Ib. 136. Or, after reciting the return of the marshal : "On consideration whereof," &c. "it is now here considered," &c., that — be discharged from the writs " in the said return mentioned," (7 Pet. 585 ;) in other words, the motion is granted. On the refusal to award the habeas corpus : " On consideration of the rule granted in this case," &c., " it is considered, ordered, and adjudged by the Court, that the rule be discharged, and that the prayer of the petitioner for a writ of habeas corpus be and the same is hereby refused." 3 Pet. 209. Or " Upon the whole, it is the opinion of the Court that the motion be overruled." " Writ denied." 7 Wheat. 45. " The rule therefore to show cause is denied, and the motion for the habeas corpus is overruled," (9 Pet. 710 ;) the motion is not granted. When this Court decides on a certificate of division of opinion of the judges of a Circuit Court, the form is : " This cause came on to be heard on the transcript of the record," &c. " on the questions and points," &c. " certified to this Court. On consideration whereof, it is the opinion of this Court," that, &c. (3 Pet. 189,) the point is decided. On an appeal in a suit in equity : " This cause came on," &c. on " consideration whereof, it is ordered and decreed," &c. 3 Pet. 221. On a writ of error to a Circuit Court : " This cause came on to be heard on the transcript of the record, &c. on consideration whereof, it is ordered and adjudged by the Court, &c." 3 Pet. 241. On a writ of error to a state Court : " This cause," &c. " on consideration whereof, it is considered and declared," &c. " It is therefore considered and adjudged," &c., (3 Pet. 267,) or, " On consideration whereof, it is ordered and adjudged," &c. (3 Pet. 291,) that the decree or judgment be reversed or affirmed. On a rule to show cause why a mandamus should not issue : " On consideration whereof, it is now here considered and ordered by this Court, that the rule prayed for be and is hereby granted," 6 Pet. 776. On the motion for a peremptory mandamus after the return : " The Court

doth therefore direct that a mandamus be awarded," &c. (7 Pet. 648;) or, "On consideration of the rule, &c., it is now here considered, ordered, and adjudged by this Court." 8 Pet. 304—306. On a motion for an attachment for not obeying a peremptory mandamus: "The motion is dismissed," 8 Pet. 590. On refusal to grant the rule to show cause: "The rule is therefore refused," (11 Pet. 174:) or on a motion for a mandamus being denied: "On consideration of the motion, &c., it is now here ordered and adjudged," &c., and "the same is hereby overruled," (12 Pet. 344. 475,) or, "The motion for the mandamus is denied." 13 Pet. 290. In applying these varied forms to the substance, it is apparent that this Court adheres to those of the common law and its principles, having, it is true, less regard to mere terms, but leaving no difficulty in ascertaining their meaning, in their use, and application to their action on the case before them. Thus, in deciding on a rule or motion, in, a case of a habeas corpus or mandamus, they use or omit as the case may be, the terms appropriate to a judgment, or those of a mere order directing or declaring the result of their opinion; yet on referring to the subject matter which they have decided, the Court in using the terms denoting judgment, always conclude on consideration of the rule, motion, petition, or return; and never leave their action open to any doubt as to the character of their decision, whether it finally disposes of the cause, or is a mere summary order, on some matter of an intermediate nature. But when the Court proceeds to render a final decree, or judgment, on an appeal, or writ of error, it is always done in the appropriate language of judgment; "This cause came on to be heard on the transcript of the record of the —— Court, &c.," on consideration whereof, &c.; showing that they act upon the cause itself, on a judicial inspection of the record, and decide on all the matters of law therein contained, (5 Pet. 199;) and not on preliminary matters which leave the cause undecided. This action is also on a final judgment or decree of the Court below; which decided the whole cause, and would have been conclusive on it, had no appeal or writ of error been taken, or if the law had allowed none; the appellate power can act only on such decrees and judgments; in appeals it acts on the facts as well as the law of the case; in writs of error, it acts only on the matters of law. 1 Wheat. 335. 2 Wheat. 142. 6 Pet. 49. 7 Pet. 149. 282. 12 Pet. 331. 13 Pet. 164.

These forms lead to the true rules and principle of law which are the test of what judgments, decrees, orders, or awards in the nature thereof, are cognisable in error, and what are not; what are so, has been seen; what are not, is most distinctly declared by this Court. "We have only to say, that a judge must exercise his discretion in those intermediate proceedings, which take place between the institution and the trial of a suit; and if in the performance of his duty, he acts oppressively, it is not to this Court that application is to be made," (8 Pet. 590. S. P. 9 Pet. 604;) "the appropriate redress, if any, is to be obtained by an appeal, after the final decree shall be had in the cause." 13 Pet. 408.

No language can apply more forcibly to a proceeding on the writ of habeas corpus. It is intermediate between the institution and trial of the suit or prosecution; it is within the discretion of the Court, to remand or discharge; their order therein, is interlocutory in its nature, not definitive of the suit, but on the mere collateral questions of bail, commitment, or discharge from process of arrest; and whether terms of judgment are used, or omitted, in granting, or refusing the motion, the substance is the same; no final judgment in the suit is, or can be rendered; it remains open for trial as fully as before the habeas corpus was awarded.

The cases in this Court on habeas corpus, are decisive of the point, that no order or judgment rendered in them are final in their nature or effect; and in the very common and familiar case of a question of freedom or slavery, which is decided on the writ of habeas corpus on a motion to discharge; it has never been doubted that the question of right, was perfectly upon a writ of homine replegiando, let the decisions on the habeas corpus have been either way.

3 G 2

On the review of the forms and principles of the common law, as adopted by this Court, there is (as is admitted) no precedent of a writ of error on a habeas corpus, being sustained, which is powerful evidence that no principle exists which can justify it; while those which are unquestioned, forbid it; and I am utterly unable to comprehend, by what sound rule of jurisprudence prescribed to the Courts of the United States, a double appellate power in the same Court, ever can be exercised over the same suit, and the same subject matter, 1. By the writ of habeas corpus ad subjiciendum; 2. By writ of error.

When appellate power is once exerted, it is spent by the judgment of the appellate Court, unless another Court is authorized to revise such judgment; if a Circuit Court exerts this power by a writ of habeas corpus, and the granting or refusing the motion to discharge is a final judgment and decision of the cause; it follows that it is not a case for this writ; for if the defendant is remanded to custody, he is in, on an execution of the judgment; or if he is discharged, he cannot be again arrested on the same process; the writ does not lie when he is at large without bail; if under bail, that is imprisonment in law. On the contrary, if the order for recommitment, or discharge, is not a final judgment in the suit, it is interlocutory, in an intermediate proceeding, depending on the discretion of the Court, in deciding a collateral point; leaving the points and matters of law, on which the last and final judgment is to be rendered, entirely open; and of consequence, presenting no matter to which a writ of error can attach; by excluding from the cognisance of the appellate Court the only questions which it can revise. In the first case, a writ of error lies, and in the second the great writ of habeas corpus lies, if any appellate power can reach the suit in that state of things; the suit, or cause, is the same, whether the party remains in prison under the original commitment, or after being brought up on that writ, he is remanded by the Court; if this exercise of its discretion is revisable by any other Court, it must be by a revision of the same subjects which had been before revised. The "cause of commitment," its "legality," its "sufficiency," "the nature and circumstances of the offence, the evidence, and the principles and usages of law;" are the subject matters of such revision by appellate power, on any writ whatever; of error, if the judgment is final; of habeas corpus, if it is only interlocutory or collateral; or (no judgment at all) if the granting or denying the motion is a mere intermediate proceeding by summary order. But if a second writ of habeas corpus is not grantable to relieve the party from even the oppression of the Court, in remanding him on the first; "it is not to this Court that application must be made," (8. Pet. 590;) "and the appropriate remedy, if any is to be obtained by an appeal (a writ of error) after the final decree (judgment) shall be had in the cause." 13 Pet. 408.

To sustain a writ of error, on a proceeding on a writ of habeas corpus under the Judiciary Act, a mere inquiry must be construed to mean a final judgment, a final decision; the cause of commitment becomes the cause of action, or prosecution, the suit, the original suit, the cause; and an authority resting alone on a statute, conferred "for the purpose of inquiring" only, by the fourteenth section, by one writ, must be assumed under the twenty-second, or twenty-fifth by another writ, whose office, the action upon it, and the subjects of action are wholly different. The past decisions of this Court must also be radically revised, in order to so shape their definitions, and action, as to meet this altered condition of the law; the process of revision must also be applied to the Judiciary Act, whereby the refusal to grant a rule, or motion to discharge, will be made to mean the final judgment, the determination of the suit, and a recognisance of bail for the appearance of the party at the trial thereof, to be an award of execution, or à contra. By an order of discharge before trial, "proceed to a final decision of the cause," though not even the indictment is found, and thus convict or acquit the party in a writ of error, to a Court, on the proceeding of mere inquiry into the cause of his commitment; for it must be remembered, that when this Court decides on a writ of error, the judg-

ment below must be either affirmed or reversed; this Court must give the same judgment as the Court below should have done, unless in the excepted cases, which cannot arise on the habeas corpus. And when this is done, there remains the further act of directing a special mandate to another Court, to award execution of the judgment of this; or for this Court to do it, in the case provided for. 1 Wheat. 353, &c.

There must also be infused into the law, some mode or process by which the order for commitment, bail, or discharge, may be superseded by the party suing out the writ of error; some provision must be also made, as to the progress of the prosecution during the pendency of the writ of error. Now process may be issued, or a new indictment may be found for the same offence, nay, a trial may be had, before this Court can decide on the sufficiency of the first cause of commitment; and when they shall have done this by "a final decision of the cause" or suit, and sent their "special mandate to award execution thereupon," the return to that mandate may be, that the party has been arrested on other process, convicted of the offence, or is at liberty after an acquittal. This Court can award no execution till the cause has been once remanded, under the twenty-fifth section as it now reads. So, in a case coming within the exception of the twenty-fourth, for in all other cases, they must, on reversing, render the same judgment which ought to have been rendered below.

Now if we had reversed the judgment of the Supreme Court of Vermont, we could have rendered a judgment of discharge, for there are no damages to be assessed, and nothing uncertain to be adjudged; yet we could award no execution till a mandate had been first sent, and returned unexecuted, or not returned, or returned with the above or the same reasons, as are to be found on the return to the mandate in Hunter *vs.* Martin, 7 Cranch, 628. 1 Wheat. 305, 306. "That the writ of error in this cause was improvidently allowed under the authority of that act; (the twenty-fifth section) "that the proceedings thereon in the Supreme Court were "coram non judice" in relation to this Court, and that obedience to its mandate be declined by the Court."

If such an occurrence has actually happened in a case, where this Court had undoubted jurisdiction, it may be expected in future cases of a writ of error in one like the present; which can be brought within the law, only by a successive train of implication upon implication, till ingenious reasoning may fasten it to some expression, which may be thought to justify the assumption of the power. But more than jurisdiction must be assumed, before this Court could exert it to the extent which such a case requires; for though resistance to its mandate may be contingent, or merely possible, it ought to be well considered, whether, when it should happen, the Court felt assured that they would be sustained by the law and Constitution, in enforcing obedience by mandamus, attachment, and the imprisonment of the judges of the highest Court of a state.

It is not enough that the term "any suit" may embrace a case of habeas corpus; it must be one which in all other respects admits of the action prescribed in the Judiciary Act, in all its provisions relative to the appellate jurisdiction of this Court; if it is, there will be found no defect of power to execute its final mandate, or execution, by the authority of this Court. If it is not, then if the Court assumes jurisdiction, it must usurp power to carry into effect a judgment which the law does not recognise, and consequently makes no provision for its execution. It is dangerous, at least, if not unwise or rash, to exercise a power which may be given by the Constitution; but which Congress has given no authority to execute, or given in terms so obscure, that to so construe them, is in substance the exercise of legislative power, by the judicial department. However desirable it may be thought to enlarge jurisdiction, and expand its exercise so as to embrace cases not yet known to the law, or by so construing the Constitution and law, as to make it by

reasoning what it ought to have been in the text; and giving inference and incident the effect of ordinance and enactment, increase the ostensible power of the Court; yet assuredly it will continue to lose, in public confidence, that moral strength, which can alone insure its efficient and quiet action, in the same proportion as it extends ungranted jurisdiction. No course appears to me to lead more certainly to such results, than that which the Court has been urged to take in this case; had we reversed the (so called) final judgment, and our mandate had encountered new process, &c. &c. our own solemn judgment would have had a most ludicrous effect, as a final decision, of what? not the suit, cause, or prosecution, but on the legality of the original process, which is a most conclusive reason why a decision on mere process is not the subject of a writ of error. Or had the matter remained as it was, our reversal would have respected only the refusal to discharge the party from the process; our mandate to discharge, would, if executed, leave him liable to arrest on new process, without affecting the suit; which is an equally conclusive reason to show that a final decision in error on the habeas corpus is not such as is contemplated by the twenty-fourth or twenty-fifth sections, or provided for by either.

Or should that Court refuse obedience to our mandate, the predicament of this Court would be precisely the same as in Hunter vs. Martin; they must at the next term proceed in one of the following modes.

1. Follow the precedent of Hunter vs. Martin—issue "a writ of error" to the Supreme Court of Vermont, "founded" on their "refusal to obey the mandate of this Court;" raise that refusal to the dignity of a final judgment, (vide 1 Wheat. 305,) and then reverse it, and affirm "the judgment of the District Court." Ib. 262. This however would not be a course appropriate to the present case; there is no judgment of any inferior Court, or if there was, this Court would have no power by the twenty-fifth section, to affirm or reverse it, because the decision complained of was had in the highest Court of law of the stat , (6 Pet. 49;) nor could any mandate be directed to any other Court, (1 Wheat. 353 . 8 Pet. 314;) and it requires no reasoning to show that this Court ought not, and would not deal with the jailor or other person who had the custody of the relator. 7 Pet. 282.

2. "Proceed to a final decision of the cause and award execution," as specially authorized by the twenty-fifth section; but this would be abortive, as there could be no final decision of the cause of prosecution, on a mere inquiry into the cause of commitment; nor cor'ld any execution be awarded against person or property; and the nature of the cas. precludes any efficient action, save by a mandate to be directed to the Court, most certainly not to the jailor.

3. Issue a peremptory mandamus to the judges, to carry the mandate into effect, (Vide 5 Cranch, 116. 7 Pet. 648. 8 Pet. 305;) which is expressly authorized by the fourteenth section of the Judiciary Act, and is most appropriate to this case; it being necessary for the exercise of the appellate jurisdiction of this Court, and agreeable to the principles and usages of law—the common law. 12 Pet. 492, 493. And if that mandamus is not obeyed, then on the authority of the seventeenth section, award an attachment, and if no sufficient cause is shown to avert it; "punish by fine and imprisonment," this "contempt of authority." Vide 1 Story, 59, 60. Vide 8 Pet. 588. 590.

Such is the power with which this Court is invested by the Constitution and laws, so it may, and ought to be exerted, whenever it becomes necessary to exercise its appellate jurisdiction, in vindicating its authority to enforce the law in its majesty, upon any tribunal, which has rendered a judgment under state authority in violation of the Constitution, a law, or treaty of the United States; and refuses to obey the mandate of reversal.

On every caso which lawfully invokes the action of these powers, this Court, I trust, will not hesitate to exert it, that it will, by so doing, "plant" itself in

public opinion and confidence, on an "impregnable position," (11 Pet. 139,) I cannot doubt; nor, that when this Court deliberately takes the first step in exercising jurisdiction on a writ of error to a state Court, they will be prepared, and resolved to take the last, should the exigencies of the case invoke it. But if the Court is not well assured that the law of the case will fully justify the last, the time for reflection is before the first step is taken: otherwise they may be induced, if not compelled, to halt, to retrace their steps by retrogression, or to stop the progress of the cause to final judgment and execution, from a doubt whether they have, or the conviction that they have not, the legitimate power to finish what they had begun.