Carola W. ROTHSCHILD, Walter N. Rothschild, Jr. and Alan M. Stroock as Executor of the Last Will and Testament of Walter N. Rothschild, and Carola W. Rothschild, Individually,

v.

The UNITED STATES.

No. 130–65.

United States Court of Claims.

Feb. 14, 1969.

Morton L. Deitch, New York City, attorney of record, for plaintiffs; Bernard E. Brandes and Michael M. Umansky, New York City, of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller and Ira M. Langer, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

SKELTON, Judge.

This is a suit brought by the executors of the estate of Walter N. Rothschild, deceased, for the recovery of income taxes paid as the result of deficiency assessments involving the years 1955 and 1956, made by the Commissioner of Internal Revenue.* The dispute arose out

---

* We are indebted to Trial Commissioner William E. Day for his opinion, findings of fact and recommended conclusion of law submitted under the order of reference and Rule 57(a). We have adopted his findings of fact in their entirety and·

of a series of transactions in which the taxpayer, Walter N. Rothschild (now deceased) [1] borrowed funds to make an investment which initially would yield him a loss. However, by deducting the interest paid from ordinary income and paying capital gains tax on the profits of the investment, the taxpayer's investment yielded an after-tax profit.

During the years 1955 and 1956, taxpayer engaged in three separate transactions, borrowing funds (at high rates of interest) to purchase United States Treasury notes, which notes paid interest at rates substantially lower than the interest rates taxpayer agreed to pay on the borrowed funds. In each transaction, the notes purchased had had some interest coupons detached therefrom, thereby making an artificially low purchase price for the taxpayer. Therefore, taxpayer was able to acquire the Treasury notes at less than face value, so that upon their maturity, taxpayer realized a long-term capital gain. Taxpayer reported a long-term capital gain in the amount of $35,184.37 on his 1956 joint income tax return (for the first of the three transactions) and a long-term capital gain in the amount of $52,700 on his 1957 joint income tax return (for the second and third transactions). In connection with these transactions, taxpayer deducted from ordinary income, prepaid interest in the amount of $60,135.42 for the first transaction and in the amount of $93,947.78 for the second and third transactions.

Upon audit of taxpayer's 1955, 1956 and 1957 tax returns, the Commissioner of Internal Revenue disallowed the above interest deductions on the ground that the transactions were entered into solely for the purpose of creating interest deductions for tax purposes, and therefore the deductions were not allowable under section 163(a) of the Internal Revenue Code. The Commissioner of Internal Revenue, therefore, assessed a deficiency against the taxpayer in the amount of $51,531.09 for the year 1955 and in the amount of $58,665.61 for the year 1956.

Taxpayer timely paid the assessment and timely filed claims for refund for the relevant periods. Notices of disallowance of the claims for refund were sent to taxpayer. This suit is timely filed.

The issue is: whether interest paid for borrowed funds to be invested in a transaction which on its face yields no net pre-tax earnings but provides for a built-in economic loss (due to the fact that the interest expense is greater than the maximum possible capital gain) is deductible from ordinary income under section 163(a) of the Internal Revenue Code of 1954.

The facts surrounding the three transactions in which taxpayer participated are fully set out in the findings of fact, *infra*. All three transactions are substantially identical—they differ only in form, i.e., the banks used, the amounts borrowed and the time of purchase. Therefore, in the interest of simplicity, the facts of the first transaction will be briefly stated as background for this opinion, it being understood that the law is equally applicable to all three transactions.

During the relevant period, taxpayer was a man of substantial means, placing him in the vicinity of the 90 percent tax bracket. Early in 1955, taxpayer was introduced to Lawrence W. Snell, a registered securities dealer in New York City, who operated a brokerage office under the name of Lawrence W. Snell and Company at 60 Wall Street, New York, New York. The purpose of the introduction was for Snell to present taxpayer with a plan which would yield taxpayer a substantial amount of after-

have borrowed extensively from his opinion, but have reached a different conclusion.

1. The plaintiffs herein are Carola W. Rothschild, joint taxpayer with Walter N. Rothschild, deceased, and Carola W. Rothschild, Walter N. Rothschild, Jr. and Alan M. Stroock, executors of the last will and testament of Walter N. Rothschild, deceased, (all hereinafter called "plaintiff").

tax profit. Although capital gain was the primary concern of the plan presented to the taxpayer, the effectiveness of the plan depended on certain deductions from ordinary income in order to yield an after-tax profit. Snell was aware of this, and the tax consequences were fully discussed with Rothschild. In fact, without the tax deductions, the plan would be unworkable and Snell would not have approached taxpayer with the proposed transaction.

## The Transaction

On December 6, 1955, taxpayer purchased from the Snell company for $1,464,815.63, a total of $1,500,000 face value United States 2% Treasury notes, due August 15, 1956. The notes so purchased had the February 15, 1956 and August 15, 1956 interest coupons detached. The Snell company had purchased the notes with the interest coupons attached, through regular channels in the established government bond market. Subsequently, it sold the coupons at a discount (to reflect the interest factor) to a third party. Thereafter, it sold the notes, without the coupons, to the taxpayer for $1,464,815.63.

Snell had previously arranged for the taxpayer to finance the purchase price of the Treasury notes, and in fact, did most of the detail work involved in securing the funds. Snell received a fee from the lender for arranging the loan, which fee constituted his profit on the transaction. Taxpayer signed a full recourse promissory note in the amount of $1,500,000, due August 15, 1956, with interest payable at the rate of 5¾ percent, and gave this note to the Mellon National Bank and Trust Company of Pittsburgh, Pennsylvania (the lending bank). On December 8, 1955, the purchase price of the Treasury notes was remitted to the Snell company and the balance of the $1,500,000 loan ($35,184.-37) was remitted to taxpayer.

Snell had the Treasury notes sent directly to the New York correspondent of the lending bank, where they were held as collateral for the promissory note which was executed by the taxpayer. Taxpayer's liability on the promissory note was not limited to the collateral deposited, since the note was a full recourse instrument. Furthermore, the lending bank had the right to call for additional security if it was deemed necessary.

Although the lending bank made no formal investigation into the financial situation of the taxpayer, taxpayer was well known to be a man of substantial means—in fact, during the relevant period, taxpayer's net worth was in excess of five million dollars.

On December 8, 1955, taxpayer prepaid the interest on the note, by transmitting his personal check for $60,135.-42 to the lending bank.

At the suggestion of the lending bank, taxpayer directed the bank to redeem the Treasury notes (which were being held as collateral) and apply the proceeds to the satisfaction of his loan. On August 15, 1956, pursuant to taxpayer's request, the lending bank redeemed the notes and applied the proceeds in satisfaction of taxpayer's promissory note.

Section 163(a) of the Internal Revenue Code of 1954 provides that:

§ 163. Interest.

(a) General rule.

There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

\*    \*    \*    \*    \*    \*

(26 U.S.C. § 163, 1964 ed.)

In reviewing previous cases dealing with similar transactions, it is noted that the courts have mentioned at least two general tests to determine the deductibility of interest payments. The varying principles which the courts have enunciated on the subject, have left the area quite unsettled.

One test is commonly called the "business purpose test." According to this, interest is not allowed to be deducted if no economic gain could be realized beyond a tax deduction. Another test, commonly known as the "sham test," is involved in determining whether there

is a genuine indebtedness. Here, the courts examine the circumstances surrounding the transaction in order to determine whether the transaction is a sham. If so, then they find that absent any substance to the transaction, there can be no finding of a genuine indebtedness. We will consider the sham cases first.

Historically speaking, these sham test cases grew out of a series of plans devised in the early 1950's by M. Eli Livingstone, a Boston securities broker. By combining section 163(a) with the advantageous tax rate under section 1201 on capital gains, Livingstone was able to offer taxpayers in the high income tax brackets, a substantial tax savings for a relatively small cash expense. These tax savings devices, through judicial interpretation, have become known as "Livingstone transaction." See Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127 (1st Cir. 1959); Lynch v. Commissioner of Internal Revenue, 273 F.2d 867 (2d Cir. 1959).

In the *Goodstein* case, taxpayer entered into an agreement with Livingstone for the purchase of $10,000,000 of 1⅜% United States Treasury notes. Purportedly, he gave to Livingstone a $15,000 down payment for the purchase, and Livingstone arranged a loan for the balance of the transaction. Thereupon, Livingstone ordered Guaranty Trust Company of New York (with which he had a security clearance account) to accept delivery of $10,000,000-worth of notes from a bond dealer; Guaranty Trust charged Livingstone's account with the purported purchase price and credited the same amount to the bond dealer. However, within one-half hour of this transaction, Livingstone resold the notes to the dealer, which purported to pay for them with a check drawn on the credit balance he had just received from the original sale.

On the same day, Goodstein executed a promissory note to Seaboard Investment Corp., (which Livingstone controlled) for a loan to cover the balance of the purported purchase price. He pledged the Treasury notes as collateral for his promissory note, giving Seaboard full right of hypothecation. Seaboard (a shell, with no funds to lend) directed Livingstone to sell the notes held as collateral (which Livingstone by prearrangement had already done). The purported proceeds were used to repay Livingstone for the cost of the original purchase. By this process it was made to appear that Goodstein had borrowed $9,914,212.71 (the balance of the purchase price) from Seaboard. Goodstein then gave Seaboard checks for $40,000 and $10,000, allegedly as prepaid interest on this loan. Seaboard aided the situation by lending $50,000 back to Goodstein in a simultaneous exchange of checks, so that he was never out-of-pocket the so-called interest expense. The Tax Court found (1) that the entire transaction lacked substance or reality and that no indebtedness had actually been created, which would serve as a basis for the payment of interest, and (2) that payment and simultaneous reborrowing of the $50,000 by the taxpayer could not in any case be regarded as payment of interest. In affirming, the Court of Appeals stated:

\* \* \* \* \* \*

Moreover, we are convinced that following the transactions of October 27, 1952, there existed no indebtedness from the taxpayer to Seaboard. Despite the transitory possession by the Guaranty Trust Company of the Treasury notes for Livingstone's account who was acting as the taxpayer's agent, there was never in substance either a purchase of the notes by the taxpayer or borrowing of the purchase funds from Seaboard \* \* \*

(267 F.2d 127, 131.)

This court, on two occasions, stated its agreement with the *Goodstein* case. In Broome v. United States, 170 F.Supp. 613, 145 Ct.Cl. 298 (1959) and Oritt v. United States, 357 F.2d 692, 174 Ct.Cl. 1136 (1966), the court looked through the form of the transaction in order to determine the true substance. In both instances, the court found that where the transaction does not give rise

to an actual indebtedness and there is no true obligation to pay interest, the alleged interest payments will not be deductible under section 23(b) of the 1939 Code (the predecessor to section 163(a) of the 1954 Code).

It is quite obvious in the above cases that the court was looking to the substance of the transaction, without any regard for the tax consequences. Its only interest was to determine whether the transaction was a sham. In doing so, the court viewed the nature of the transaction in its entirety to determine whether there was any significance to what the parties did or whether the total transaction placed the parties in the same position they previously occupied in such a manner so as to call the transaction a sham. These cases present no problem because they merely interpret the term interest according to its common meaning, to wit, "compensation allowed by law or fixed by the parties, for the use or forebearance of money or as damages for its detention." Anna Foster, 45 BTA 126 (1941) aff'd, Foster's Estate v. Commissioner, 131 F.2d 405 (5th Cir. 1942). Since these cases presented situations where no loan was actually made, or no interest was actually paid, there was no true indebtedness. It was not a case of payment for the use or forebearance of money.

The instant case is not a sham, as there was substance to the transaction. Rothschild borrowed the money and gave his personal note to secure its payment. He was personally liable on the note. The treasury notes were purchased with the borrowed money and became the property of Rothschild. He pledged the securities to secure payment of his note. The bank had the right to call on him for additional se-

curity if it decided this was necessary. Rothschild paid the interest on the note in advance by his personal check on his private bank account. The undertaking was real and legal in all respects. Under these circumstances, the decisions in the sham type cases are not applicable and do not govern our opinion in this case.

We turn now to the "business purpose test" cases. Obviously, these cases do not involve sham situations, but are concerned with transactions of substance that are legal and binding on the parties. They deal primarily with the problem of whether or not interest is to be allowed to a taxpayer in a transaction where he could realize no economic gain apart from a tax deduction. These cases have not been uniform and some seem to be in apparent conflict with each other. This has caused some confusion and has left the law in this field in a somewhat unsettled state. Some of the cases emphasize the motive of the taxpayer and hold that where there is no business purpose except to gain a tax deduction, the interest is not deductible. Other decisions say that if the transaction is a scheme to avoid taxes, it is a sham even though a legal undertaking, and the interest cannot be deducted. Still other cases say the motives or purposes of the taxpayer are immaterial and the interest deduction will be allowed if there is a genuine indebtedness. Some of the courts hold that the deduction will be disallowed if the transaction does not appreciably affect the beneficial interest of the taxpayer, apart from taxes; while other courts prefer to say that Congress never intended to allow a tax deduction in a transaction that has tax avoidance as its sole purpose. Many law review articles have been written on the subject.[2] Some are helpful,

2. See Blum, Knetsch v. United States: A Pronouncement on Tax Avoidance, 40 Taxes 296 (1962); Blum, Motive, Intent, and Purpose in Federal Income Taxation, 34 U.Chi.L.Rev. 485 (1967); Chirelstein, Learned Hand's Contribution to the Law of Tax Avoidance, 77 Yale L.J. 440 (1968); Fuller, Business Purpose, Sham Transactions and the Relation of Private

Law to the Law of Taxation, 37 Tul.L. Rev. 355 (1963); Guterman, Substance v. Form in the Taxation of Personal and Business Transactions, N.Y.U. 20th Inst. on Fed.Tax. 951 (1962); Harrar, Is Interest Deductible Only if the Debt Has a Nontax Profit Purpose? 13 J. Taxation 258 (1960); Port, Tax Avoidance Use of the Interest Deduction, 45 Texas L.

while others serve only to emphasize the difficulty of the problem.

One of the earlier cases on this subject was the Supreme Court decision of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). That case involved a corporation which was wholly owned by a taxpayer, which transferred 1,000 shares of stock in another corporation held by it, among its assets to a new corporation. The new corporation thereupon issued all of its shares to the taxpayer. Thereafter, the new corporation was dissolved and liquidated by the distribution of the 1,000 shares to the taxpayer who immediately sold the stock for profit. No other business was transacted or intended to be transacted by the new corporation. The whole plan was designed to conform with section 112 of the 1928 Revenue Act as a reorganization, for the sole purpose of transferring the shares in question to the taxpayer, with a resulting tax liability less than that which would have ensued from a direct transfer by way of dividend.

The court indicated that if the transaction was in reality a reorganization, the ulterior purpose of tax avoidance would not prevent the tax deduction sought. The Court said:

\* \* \* It is quite true that if a reorganization in reality was effected within the meaning of subdivision (B), the ulterior purpose mentioned will be disregarded. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. \* \* \* But the question for determination is whether what was done,

apart from the tax motive was the thing which the statute intended. \* \* \* *Id.* at 469, 55 S.Ct. at 267.

But the court then found that aside from the tax motive, there had been no real reorganization of the business, even though what was done was legal, and that the real purpose of the whole transaction was to transfer shares of the corporation to the taxpayer in a manner that would avoid taxes. The Court stated:

\* \* \* Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death.

In these circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted

Rev. 1218 (1967) ; Kanter, The Interest Deduction: When and How Does it Work, N.Y.U. 26th Inst. on Fed.Tax. 87 (1968) ; Doukas, Tests for Deductibility of Interest Payments: Is Business Purpose Necessary? N.Y.U. 19th Inst. on Fed.Tax. 1259 (1961) ; Doukas, Though Tax-savings Is Only Motive, Interest Is Deductible, IRS Concedes, 14 J. Taxation 292 (1961) ; Harrar, Courts Are Upholding Few Tax Plans that Cannot Show Good Business Purpose, 16 J.

Taxation 130 (1962) ; Kamensky, Can the "Business Purpose" Dictrine Be Used to Deny an Interest Deduction? 27 J. Taxation 138 (1967) ; O'Connor, Knetsch Means Interest Is Allowable Only if Loan Has Real Business Purpose, 14 J. Taxation 160 (1961) ; Summers, A Critique of the Business-Purpose Doctrine, 41 Ore. L.Rev. 38 (1961). Note: "The Business Purpose" Doctrine and Interest Deductions, 39 St. John's L.Rev. 77 (1964).

according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose. *Id.* at 469–470, 55 S.Ct. at 267.

The Court denied the taxpayer the tax deduction because the only purpose of the transaction, even though legal, was to effect a tax reduction.

The principles announced in Gregory v. Helvering, supra, have been cited and approved many times by the courts. In the case of Loewi v. Ryan, 229 F.2d 627 (2d Cir. 1956) the court said, after citing the *Gregory* case:

> * * * The purpose of the Act was to exempt from tax only such legal transactions as arose out of an enterprise or venture that had some other authentic object of its own, and were neither alien and hostile to the raising of revenue, nor designed to effect no change in legal interests except to defeat a tax. * * * *Id.* at 629.

The *Gregory* decision was discussed in the case of Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399 (2d Cir. 1957), where the court said:

> The principle of the Gregory case has been applied again and again by the Supreme Court. * * *
>
> * * * * * *
>
> * * * [N]ot every advance cast in the form of a loan gives rise to an "indebtedness" which will justify a tax deduction. *Id.* at 404.

The court said, in effect, that even though the transaction was legal, the taxpayer, in order to have the tax deduction, must show that the undertaking did not conflict with the intent of Congress. The court said:

> * * * The principle is fully as applicable where there is no doubt that a very real transaction has taken place and the question is whether the characterization urged by the taxpayer accords with substantial economic reality. In either case the taxpayer must show that his treatment of the transaction does not conflict with the meaning the Congress had in mind when it formulated the section *sub judice. Id.* at 406.

The majority of the court in the *Gilbert* case remanded the case to the trial court for additional findings, but Judge Learned Hand dissented on the ground that the remand instructions should describe the test to be applied to determine the deductibility of the taxpayer's tax deductions. In his dissent, he made the following statement which was later cited with approval by the Supreme Court, and which is a landmark in this field of litigation:

> However, it is also settled that, although the rights of a taxpayer may be absolute as between himself and his corporation, the law will at times refuse to regard those rights in assessing his income tax. That doctrine stems from Gregory v. Helvering, * * *; at least that is the source usually ascribed to it. It is a corollary of the universally accepted canon of interpretation that the literal meaning of the words of a statute is seldom, if ever, the conclusive measure of its scope. Except in rare instances statutes are written in general terms and do not undertake to specify all the occasions that they are meant to cover; and their "interpretation" demands the projection of their expressed purpose, upon occasions, not present in the minds of those who enacted them. The Income Tax Act imposes liabilities upon taxpayers based upon their financial transactions, and it is of course true that the payment of the tax is itself a financial transaction. If however, the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except

to reduce his tax, the law will disregard it; for we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose. Gregory v. Helvering, supra; Griffiths v. Helvering, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Bazley v. Commissioner, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782. Id. at 411.

In the case of Diggs v. Commissioner of Internal Revenue, 281 F.2d 326 (2d Cir. 1960), cert. denied, 364 U.S. 908, 81 S.Ct. 271, 5 L.Ed.2d 224, the court denied the claimed tax deduction on the ground that the only motive the taxpayer had was tax avoidance and that there was no other realistic financial benefit. The court said:

> * * * The opinion in Gregory v. Helvering permits proper tax avoidance. * * * [A]t the least Gregory v. Helvering requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance. * * * Id. at 329–330.

It will be noted that in the above-cited cases of Loewi v. Ryan, Gilbert v. Commissioner, and Diggs v. Commissioner, the courts cited with approval the principles of Gregory v. Helvering, supra.

It was with this background that the Supreme Court handed down its decision in the case of Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L. Ed.2d 128 (1960). In that case, the taxpayer purported to purchase from an insurance company, annuity contracts with a face value of $4,000,000 at a cost of $4,004,000. Taxpayer spent only $4,-000 of his own funds to purchase the contracts. The remainder was borrowed from the insurance company on a 3½ percent non-recourse note secured by the annuity contracts. The amounts invested in the contracts earned interest at 2½ percent, which resulted in increasing the cash surrender value of the policies. The increase in the cash surrender value served as collateral for subsequent additional loans, which were more than adequate to pay the annual interest charges on the loan. The taxpayer's equity in the annuity contracts was negligible at all times. The contracts were to mature when taxpayer was 90 years old at which time the amount available for the annuity would have been $1,000. (This was based on the fact that in advance of each year, Knetch would borrow each year's increase in the net cash value of the contract, minus $1,000.) During the two taxable years Knetsch paid the insurance company $294,570 and received from the insurance company in the form of loans $203,000. In 1956, taxpayer terminated the contracts, surrendered the bonds, obtained a cancellation of the indebtedness and received the $1,000 cash surrender value. By deducting interest, taxpayer would have received $233,297 in tax savings.

In denying the taxpayer's claimed interest deduction, the Supreme Court quoted with approval the dissenting opinion of Judge Learned Hand in Gilbert v. Commissioner of Internal Revenue, supra, and held that Knetsch's transaction did not appreciably affect his beneficial interest except to reduce his tax, which was fatal to his interest deduction. In this connection, the Court said:

> * * * Plainly, therefore, Knetsch's transaction with the insurance company did "not appreciably affect his beneficial interest except to reduce his tax * * *." Gilbert v. Commissioner, 248 F.2d 399, 411 (dissenting opinion). For it is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction. What he was ostensibly "lent" back was in reality only the rebate of a substantial part of the so-called "interest" payments. The $91,-570 difference retained by the company was for its fee for providing the facade of "loans" whereby the petitioners sought to reduce their 1953 and 1954

taxes in the total sum of $233,297.68. There may well be single-premium annuity arrangements with nontax substance which create an "indebtedness" for the purposes of § 23(b) of the 1939 Code and § 163(a) of the 1954 Code. But this one is a sham. *Id.* at 366, 81 S.Ct. at 135.

While it is true that the court called the transaction a sham, the main thrust of the opinion was that the interest deduction was denied to the taxpayer because the transaction "did not appreciably affect his beneficial interest except to reduce his tax." This becomes increasingly clear when the opinion is construed along with Judge Hand's approved dissenting opinion in the *Gilbert* case, *supra.*

The plaintiff in the instant case cites the following cases and says they require the granting of the interest deduction here. L. Lee Stanton, 34 T.C. 1 (1960); Clifford F. Hood, 20 CCH Tax.Ct.Memo. 1140 (1961); Maysteel Products, Inc. v. Commissioner, 287 F.2d 429 (7th Cir. 1961) reversing 33 T.C. 1021 (1960); Fabreeka Products Co. v. Commissioner of Internal Revenue, 294 F.2d 876 (1st Cir. 1961); Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); Evans v. Dudley, 295 F.2d 713 (3d Cir. 1961), cert. denied 370 U.S. 909, 82 S.Ct. 1254, 8 L.Ed.2d 403 (1962); Halle v. United States, 346 F.2d 543 (4th Cir. 1965); and Humphreys v. Commissioner of Internal Revenue, 301 F.2d 33 (6th Cir. 1962).

An examination of these cases convinces us that they are distinguishable from the case at bar because in each of those cases the taxpayer had a possibility or opportunity to make a profit on the transaction in which the tax deduction was sought, apart from the tax deduction. Whereas, in our case, there was neither a possibility nor an opportunity of profit to the taxpayer separate and apart from the tax deduction. In most of those cases, the courts held that the motive of the taxpayer was immaterial and irrelevant on the deductibility of the tax deduction.

Looking first at *L. Lee Stanton, supra,* we find that there were two transactions, one involving the purchase of C.I.T. notes and the other the purchase of short term Treasury notes on which he expected to make a profit and on which he would have made a profit if his bank had not delayed him by refusing to release the notes when requested. An interest deduction was sought on both transactions. The court granted the deductions on both, though no reason was given for allowing the deduction on the C.I.T. notes. The court based its decision on the possibility of profit on the Treasury notes by saying:

> * * * His Treasury note transactions would have been profitable before taxes, if events had happened as he anticipated they would * * *. * * * [I]t was a transaction entered into for profit, and which resulted in a profit, if that is material here. What reason is there for penalizing Lee [taxpayer] and deviating from the plain words of the Internal Revenue Code merely because the unexpected action of the banks wiped out Lee's real gain by requiring him to pay about $126,000 of additional interest? *Id.* at 8.

That case is cited in Bridges v. Commissioner of Internal Revenue, 325 F.2d 180, 185 (4th Cir. 1963), as a case where the taxpayer made a profit, apart from the tax deduction, and for that reason was entitled to the interest deduction. See also Max Barnett, 44 T.C. 261, 281 (1965), aff'd, 364 F.2d 742 (2d Cir. 1966). We think the case stands for this proposition. This view is strengthened by the decision of the court in Clifford F. Hood, *supra,* at 1143, where the court allowed an interest deduction in a memorandum opinion "on the authority of this Court's holding in L. Lee Stanton, 34 T.C. 1 (1960)."

The transactions in Fabreeka Products Co. v. Commissioner of Internal Revenue, Evans v. Dudley, Maysteel Products, Inc. v. Commissioner of Internal Revenue, Halle v. United States, and Humphreys v. Commissioner of Internal Revenue cited above, all involved similar situations.

The taxpayers bought bonds with borrowed money at a premium that were callable at a price lower than the purchase price. They took a tax deduction by way of amortization of the premium paid for the bonds, as allowed by law. Some of the taxpayers donated the bonds to tax exempt charities and took an additional deduction for the gifts. They admitted they entered into the transactions to get the tax deductions. The Government challenged the transactions as being tax avoidance schemes. The courts said the motives of the taxpayers were immaterial and allowed the tax deductions on the grounds that the taxpayers on buying the bonds had all the rights of ownership, including the possibility of making a profit if their value increased or the chance of losing money if their market price declined.

The case of Commissioner of Internal Revenue v. Brown, *supra*, cited by plaintiff is somewhat different to the other cited cases, but is also distinguishable on the facts from the instant case. There the taxpayer sold property to a charitable institution which was to pay for it out of 72 percent of the tax-free profits of the business for five years or less then owned by the institution. The Government contended there was no sale within the meaning of the capital gains statutes and regulations, because there was no down payment and no personal obligation to pay for the property, and the purchase price was to come from the tax-free profits of the charity. The court held that there was substance to the transaction and that a sale had occurred. The court said:

> Having abandoned in the Court of Appeals the argument that this transaction was a sham, the Commissioner now admits that there was real substance in what occurred between the Institute and the Brown family. The transaction was a sale under local law. The Institute acquired title to the stock of Clay Brown & Company and, by liquidation, to all of the assets of that company, in return for its promise to pay over money from the operating profits of the company. If the stipu-

lated price was paid the Brown family would forever lose all rights to the income and properties of the company. Prior to the transfer, these respondents had access to all of the income of the company; after the transfer, 28% of the income remained with Fortuna and the Institute. Respondents had no interest in the Institute nor were they stockholders or directors of the operating company. Any rights to control the management were limited to the management contract between Clay Brown and Fortuna, which was relinquished in 1954. *Id*. 380 U.S. at 569–570, 85 S.Ct. at 1165.

\*　\*　\*　\*　\*　\*

> Were it not for the tax laws, the respondents' transaction with the Institute would make no sense, except as one arising from a charitable impulse. However the tax laws exist as an economic reality in the businessman's world, much like the existence of a competitor. Businessmen plan their affairs around both, and a tax dollar is just as real as one derived from any other source. The Code gives the Institute a tax exemption which makes it capable of taking a greater after-tax return from a business than could a nontax-exempt individual or corporation. Respondents traded a residual interest in their business for a faster payout apparently made possible by the Institute's exemption. The respondents gave something up; they received something substantially different in return. If words are to have meaning, there was a "sale or exchange." *Id*. at 579–580, 85 S.Ct. at 1171.

We do not think the above case contributes anything to the plaintiff's position in our case, except that it makes clear that there is nothing wrong with a taxpayer's motive or plan to avoid or lessen his taxes in a legitimate and substantive business transaction. The defendant concedes this right to the taxpayer in our case, but likens it to the plan of a taxpayer to invest in tax-exempt bonds in order to save taxes, which is certainly

proper in every way. Actually, defendant here contends that the *Brown* case, *supra*, supports its position in the instant case.

We now turn to a consideration of cases cited by defendant in addition to the *Gregory, Gilbert, Loewi, Diggs* and *Knetsch* cases, *supra*, already discussed. These cases are Bridges v. Commissioner of Internal Revenue, 325 F.2d 180 (4th Cir. 1963); Goldstein v. Commissioner of Internal Revenue, 364 F.2d 734 (2d Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967); Max Barnett, 44 T.C. 261 (1965), aff'd, 364 F.2d 742 (2d Cir. 1966); and Sidney B. Lifschultz, 25 CCH Tax Ct.Memo. 1146 (1966), aff'd, 393 F.2d 232 (2d Cir. 1968).

In Bridges v. Commissioner of Internal Revenue, *supra*, the transactions were the same as those in our case. The court held that the transactions were shams because, apart from the interest deductions, there was no way the taxpayer could have profited by the transactions. The court said:

> Although the particular transaction involved in the case of Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), consisted of the purported purchase of an annuity contract with funds purportedly borrowed from the insurance company which "sold" the annuity contracts, the repayment of the "borrowed" funds being secured by the annuity contracts, the principles there laid down by the Supreme Court are not only applicable, but controlling, in the determination of the instant case.[5]

5. In deciding the Knetsch case as it did, the Supreme Court settled a difference of views held by certain federal courts by expressly disapproving the decisions in United States v. Bond, 258 F.2d 577 (5th Cir. 1958), and Roderick v. United States, 59–2 U.S.T.C. § 9650 * * * reversed 290 F.2d 823 (5th Cir. 1961). These decisions had, in effect, held that despite the realities of a transaction, if it appeared *in form* to be what the statute intended, i. e., interest paid on indebtedness, the claimed deduction was allowable.

In the case of Goldstein v. Commissioner of Internal Revenue, *supra*, the taxpayer won a large sum of money in the Irish sweepstakes. She entered into a transaction like the one in our case and claimed an interest deduction. The court decided that the transaction was legal and not a sham, but disallowed the deduction, saying:

> * * * [P]etitioner's purpose in entering into the * * * transactions "was not to derive any economic gain or to improve here [sic] beneficial interest; but was *solely* an attempt to obtain an interest deduction as an offset to her sweepstake winnings." * * * *Id*. 364 F.2d at 738.
>
> * * * * * *
>
> We hold, * * * that Section 163 (a) of the 1954 Internal Revenue Code does not permit a deduction for interest paid or accrued in loan arrangements, like those now before us, that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences. See Knetsch v. United States, 354 U.S. 361, 366, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); * * *. *Id*. at 740.
>
> * * * * * *
>
> * * * [N]otwithstanding Section 163(a)'s broad scope this provision should not be construed to permit an interest deduction when it objectively appears that a taxpayer has borrowed funds in order to engage in a transaction that has no substance or purpose aside from the taxpayer's desire to obtain the tax benefit of an interest deduction: * * * *Id*. at 741–742.

For other decisions where the transactions involved were somewhat similar to those in the instant case, i. e., the "purchase" of securities with funds obtained through "loans" and the pledge of the securities as collateral and where the courts followed and applied the principles stated in Knetsch, see Rubin v. United States, 304 F.2d 766 (7th Cir. 1962); MacRae v. Commissioner of Internal Revenue, 294 F.2d 56 (9th Cir. 1961); Kaye v. Commissioner, 287 F.2d 40 (9th Cir. 1961). *Id*. at 184.

It is clear that the court in that case disallowed the interest deduction in a transaction like the one in our case because it lacked purpose, substance, or utility apart from the expected tax consequences. This was true, even though the transaction was not a sham but a legal undertaking.

The court said in Barnett v. Commissioner of Internal Revenue, 364 F.2d 742 (2d Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967):

> 1. * * * We here hold that Congress did not "intend" Section 163(a) to be utilized by taxpayers who are motivated to borrow funds for no other reason than to obtain a Section 163(a) deduction. * * * *Id.* at 744, n. 1.

In that case, the taxpayer won $50,000 in a newspaper contest. He purported to buy Treasury certificates of the par value of $750,000 by borrowing the money on his note. He prepaid the interest with his personal check and pledged the certificates to secure the loan. Within 30 days (after the end of the taxable year) the broker purported to repurchase the certificates from the taxpayer (without consulting him) and credited his account accordingly, and rebated to him ⅚ of the interest he had paid the previous December. The Tax Court found that he had never acquired control over the certificates and that the entire transaction was a sham.[3] The Tax Courts said that the taxpayer had not shown any possibility of economic gain and that no profit from a differential in interest rates or appreciated value could have been realized. The Tax Court said further:

> * * * [T]here was nothing of substance to be realized by petitioner from the transaction in question without regard for and except for the tax deduction—* * *. 44 T.C. 261, 280 (1965).

The Tax Court upheld the disallowance of the deduction and the Court of Appeals affirmed. 364 F.2d 742 (2d Cir. 1966).

The most recent case on the problem before us is *Lifschultz, supra.* In that case, the taxpayer engaged in five different transactions, with the fourth and fifth being the same as in the instant case. He attempted to deduct the prepaid interest as the taxpayer did in our case. The Tax Court disallowed the deduction, saying the first three transactions were "sham" and the last two were not entered into with the purpose of making a profit, although they were not shams, citing Goldstein v. Commissioner of Internal Revenue, *supra.* The Second Circuit Court of Appeals affirmed the judgment of the Tax Court, saying:

> We find it unnecessary to decide whether any or all of the five transactions were sham since we are persuaded that all were entered into "without any realistic expectation of economic profit and 'solely' in order to secure * * * interest deduction[s]" Goldstein v. Commissioner of Internal Revenue, supra, 364 F.2d at 740.

In the Goldstein case we held, citing Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128, (1960), that where transactions similar to those involved in the present case, though they could not be characterized as "sham," "had no substance, utility, or purpose beyond the tax deduction," the controverted payments did not constitute interest within the meaning of Section 163(a) and were not deductible. Goldstein v. Commissioner of Internal Revenue, supra, 364 F.2d at 742. *Id.* 393 F.2d at 234.

The court pointed out that the possibility of profit for the taxpayer on the transactions was very remote, and that a comparison of the interest rates on the bonds with those on the borrowed money notes demonstrated the certainty of an initial loss. The fact that the taxpayer did not hold the bonds until maturity, which would have been the only time they could have had any additional value, indicated to the court that "his motive was not to realize a profit but to secure a tax reduc-

---

3. 44 T.C. 261 (1965).

tion." The court said it was unnecessary to decide whether the transactions were sham since they were entered into without any realistic expectation of economic profit and solely in order to secure interest deductions. It was pointed out by the court that they had held in the *Goldstein* case, *supra,* that in similar transactions which were not shams, the payments were not interest within the meaning of Section 163(a) and were not deductible because they "had no substance, utility, or purpose beyond the tax deduction."

The plaintiff argues in the instant case that the deductibility of interest in a situation like the one before us is a matter that should be left to Congress, and that we should not decide it by "judicial legislation." He points out that Congress has failed to act on the deductibility of interest in certain situations on a number of occasions when the question has been considered by it. From this, plaintiff concludes that Congress must intend for interest to be deductible when paid on any legal transaction. The defendant counters this argument by saying that in every case considered by Congress, the transaction, though tax motivated, had economic reality and substance apart from the tax result. It says that Congress never intended Section 163 to allow interest deductions on debts that were created for no other reason than to obtain a Section 163(a) deduction.

It is difficult to determine the intent of Congress by considering what it did not do in a given situation. This is closely akin to speculation. We must be governed by what Congress did. Here we have the Income Tax Act passed by the Congress which imposes liabilities upon taxpayers based upon their financial transactions. As Judge Hand said in Gilbert v. Commissioner of Internal Revenue, *supra:*

> * * * [W]e cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose. * * * *Id.* 248 F.2d at 411.

In Loewi v. Ryan, *supra,* the court said:

> * * * The purpose of the Act was to exempt from tax only such legal transactions as arose out of an enterprise or venture that had some other authentic object of its own, and were neither alien and hostile to the raising of revenue, nor designed to effect no change in legal interests except to defeat a tax. * * * *Id.* at 629.

The Supreme Court had said earlier in the case of Gregory v. Helvering, *supra:*

> * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * * * *Id.* at 469, 55 S.Ct. at 267.

As will be recalled, the Court disallowed the tax deduction in that case and denounced the transaction as "an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." On the question of statutory intent, the Court said further:

> * * * [T]he transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose. *Id.* at 470, 55 S.Ct. at 268.

Again, on the question of statutory intent, the Second Circuit Court of Appeals, stated in Barnett v. Commissioner of Internal Revenue, *supra:*

> 1. * * * We here hold that Congress did not "intend" Section 163(a) to be utilized by taxpayers who are motivated to borrow funds for no other reason than to obtain a Section 163(a) deduction. Section 163(a) does not "intend" that a deduction be allowed in such a case. [Citing the Knetsch and Goldstein cases.] *Id.* at 744, n. 1.

Neither party has called to our attention anything in the legislative history of the statute that is contradictory to what the foregoing authorities say.

It is clear from the foregoing cases and the statute that where a transaction is a sham, the interest deduction is denied to the taxpayer. However, the "sham" standard is not the only one that must be considered in cases like the one before us. There are various others that may be applicable, depending on the circumstances. It is difficult to arrive at an exact formula that will fit every case. But, regardless of the standard or combination of standards one might use, the taxpayer in the instant case has failed to show that he is entitled to the interest deduction. The transaction here could not appreciably affect his beneficial interest except to reduce his tax. There was no way he could have made a profit, except for the tax deduction. In fact, he does not contend otherwise. He was not subjected to a risk of loss other than the built-in loss that was a part of the transaction from the beginning. He meets none of the other tests suggested to sustain a proper interest deduction. Under these circumstanecs, we hold that the plaintiff is not entitled to recover, and the petition is dismissed.