**WACHOVIA BANK & TRUST COMPANY, N.A., and J. Robert Philpott, Co-Executors of the Estate of Mary Cecil Sink, Deceased, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C-78-426-WS.**

United States District Court, M. D. North Carolina, Winston-Salem Division.

Sept. 30, 1980.

Gaither S. Walser of Brinkley, Walser, McGirt, Miller & Smith, Lexington, N. C., for plaintiffs.

Richard F. Mitchell, Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

HIRAM H. WARD, District Judge.

This matter came before the Court on the parties' cross-motions for summary judgment upon stipulated facts. Having considered the pleadings, deposition, stipulation of facts, briefs and arguments of counsel, the Court will grant plaintiffs' motion for the reasons that follow.

The plaintiffs, Wachovia Bank & Trust Co., N.A. (Wachovia) and J. Robert Philpott, are co-executors of the estate of the taxpayer, Mary Cecil Sink.

On April 25, 1974, Mrs. Sink entered into an agency agreement with Wachovia for the investment and management of her assets. At that time, Mrs. Sink was 92 years old and in poor health. Stipulation of Facts ¶¶ 1 & 2 (September 14, 1979) (hereinafter, Stipulation).

On June 27, 1974, Wachovia, as Mrs. Sink's agent, purchased United States Treasury bonds with a face value of $400,000. Wachovia purchased the bonds for $293,000, a substantial discount. The bonds paid 4.25 percent annual interest; however, because of the discounted purchase price, they would have effectively yielded 5.8 percent annually if held to maturity. They also were commonly known as "flower bonds." Flower bonds, at anytime before their regular maturity date, may be applied at par value for the payment of the holder's federal estate taxes. Wachovia borrowed the purchase price for these bonds from its Trust Division pursuant to a 30–day promissory note at an annual interest rate of 11.73 percent. Stipulation ¶¶ 3, 4 & 6.

Mrs. Sink subsequently terminated her agency relationship and created a revocable trust with Wachovia as trustee. She placed a substantial amount of assets, including the Treasury bonds, into the trust. On July 26, 1974, Wachovia, as trustee, borrowed $295,000 from the Lexington State Bank (Lexington) to pay the 30–day promissory note and $2,893.40 in interest owed thereon. Stipulation ¶¶ 7 & 8.

The Lexington loan was renewable monthly at the current prime rate of interest. Four months after procurement of that loan, the taxpayer, having received an annual payment on a note from the New York Times, reduced its principal balance by $100,000.00. The total amount of interest charged by Lexington in 1974 amounted to $13,576.25. Stipulation ¶¶ 10 & 11.

On her 1974 tax return, Mrs. Sink claimed a deduction from ordinary income for the interest paid on both the Wachovia and Lexington loans. Mrs. Sink died in July 1975. Her executors applied the flower bonds at face value in partial payment of her federal estate taxes. Stipulation ¶¶ 9, 11 & 12.

The primary purpose for purchasing the "flower bonds" was estate planning, based on the knowledge that Mrs. Sink's health was failing. To purchase the bonds Wachovia had to borrow funds because Mrs. Sink's account lacked sufficient liquid assets. Most of her assets consisted of the note previously mentioned which she received from the New York Times in conjunction with her sale of a local newspaper company. Stipulation ¶ 5; Deposition of William G. Taylor, pp. 14–20 & 27–28 (March 13, 1979).

Upon examination of Mrs. Sink's 1974 income tax return, the Internal Revenue Service (IRS) disallowed her two interest deductions. Stipulation ¶¶ 9 & 11. On October 13, 1976, plaintiffs paid $11,364.46 in assessments for unpaid income tax and interest. The IRS denied a refund claim on December 21, 1977. Plaintiffs then brought this action for the recovery of that tax and interest. The Court has jurisdiction of their claim under 28 U.S.C. § 1346. *Lewis v. Sandler*, 498 F.2d 395, 399–400 (4th Cir. 1974).

Section 163(a) of the Internal Revenue Code provides generally for the deductibility of interest: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Congress has placed a few specific limitations on that deduction. I.R.C. §§ 163(d), 264 & 265. However, the transactions involved in this case fall within none of the statutory exceptions to the general rule. The IRS, rather, contends that they fall within a judicially created exception which prohibits the deduction of purported interest payments arising out of sham transactions.

The leading case on sham transactions and the consequent denial of the interest deduction is *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). In *Knetsch*, the taxpayer bought ten deferred annuity savings bonds from an insurance company. He paid the insurance company a relatively small amount of money and executed nonrecourse annuity loan notes for the balance of the purchase price. The notes bore interest at a higher rate

than that paid by the annuity bonds. The taxpayer paid the annual interest due on the notes in advance each year. At the time of each interest payment, the company allowed him to borrow any excess of the bonds' projected year–end cash or loan value over his current indebtedness. He had only to leave $1,000 of cash value in the annuity bonds each year. He also prepaid the interest on his cash value loans at the same time. In each year he deducted the sum of the two interest payments for a large tax savings.[1]

The Supreme Court ruled that the purported interest payments were not deductible. In so doing, it first indicated that the taxpayer's tax avoidance motive was not controlling:

> "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.... But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."

364 U.S. at 365, 81 S.Ct. at 134, 5 L.Ed.2d at 132 (quoting *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 599 (1935)). In examining "what was done" the *Knetsch* Court noted that the taxpayer's "transaction with the insurance company did 'not appreciably affect his beneficial interest except to reduce his tax'" and "that there was nothing of substance to be realized by [the taxpayer] from this transaction beyond a tax deduction." 364 U.S. at 366, 81 S.Ct. at 135, 5 L.Ed.2d at 132 (quoting *Gilbert v. Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (Hand, J., dissenting)). Instead of interest payments the taxpayer had in reality paid only a fee to create the "facade of 'loans'" so that the single–premium annuity arrangement was a sham. 364 U.S. at 366, 81 S.Ct. at 135, 5 L.Ed.2d at 132.

The Fourth Circuit has applied and expanded upon the principles established in *Knetsch*. In *Bridges v. Commissioner*, 325 F.2d 180 (4th Cir. 1963), the taxpayer entered into two transactions with a securities dealer. In the first transaction, the dealer sold the taxpayer Treasury notes with interest coupons attached at a discounted price. The dealer arranged a loan for the taxpayer in the amount of the Treasury notes' face value for which the taxpayer gave a full recourse promissory note and pledged the Treasury notes as collateral. The promissory note and the Treasury notes matured the same day. The taxpayer prepaid interest on the loan. On the joint maturity date the bank redeemed the Treasury notes and cancelled the promissory note. The second transaction was similar to the first except that the dealer sold the taxpayer Treasury bonds at approximately market value; the Treasury bonds had interest coupons attached, the proceeds of which were applied to the interest due on the loan; and, pursuant to their agreement, the dealer repurchased the bonds at par before the maturity date and accelerated the maturity of the note which it then discharged. In each instance the taxpayer deducted the interest payments and reported the bond proceeds as long–term capital gains. The taxpayer's only purpose in each transaction was to create an interest deduction and to report the profit from sale of the securities at the low long–term capital gain rate. He did not expect, nor could he have expected, the profit from the securities to exceed or even equal the amount of interest he prepaid since the rate of interest on the loans was greater than the rate of return on the securities.

The Court, denying the interest deduction in *Bridges*, stated that "what was intended by section 163(a) was to create a deduction for all interest paid or accrued on *indebtedness*." It defined interest as "'compensation for the use or forbearance of money,' paid with respect to a genuine indebtedness." 325 F.2d at 184 (quoting *Deputy v. du Pont*, 308 U.S. 488, 498, 60 S.Ct. 363, 368–69, 84 L.Ed. 416, 424 (1940)) (footnotes omitted); *accord, Old Colony Railroad Co.*

---

1. The taxpayer continued this scheme for three years and terminated it during the fourth. The Court had only to consider the first two years of interest deductions.

*v. Commissioner*, 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484, 489 (1932). The court reasoned that the important factor in the *Knetsch* decision "was not so much what the taxpayer ultimately gets for his outlay, but rather what are the *possibilities* in that regard under the terms of the specific transaction under consideration." [2] 325 F.2d at 184. Therefore, it declared:

> If there is, under the realities of the terms of the transaction, some reasonable hope of the transaction appreciably affecting the taxpayer's beneficial interest other than by tax reduction, the transaction would not be a sham for tax purposes.... Furthermore, if there is, under the realities of the terms of the transaction, some risk of loss to the taxpayer, other than whatever loss might be actually "built–in" ... the transaction would not be a sham for tax purposes.

325 F.2d at 184–85 (citations omitted).

The taxpayer in *Bridges* had no prospect of financial gain from the transactions and faced no risk of loss due to a drop in the market value of the securities. Nor did he, "*at any time,* have the uncontrolled use of additional money, of the securities he had purchased or of the interest on the securities." 135 F.2d at 185. Therefore, having determined that no real indebtedness was created and having labelled the transactions

a sham, the court denied the interest deductions.

Other courts have denied interest deductions arising out of transactions analogous to those in *Bridges* without calling the transactions shams. *Rothschild v. United States*, 407 F.2d 404, 406–08, 186 Ct.Cl. 709, —— (1969); *Lifschultz v. Commissioner*, 393 F.2d 232 (2d Cir. 1968); *Goldstein v. Commissioner*, 364 F.2d 734, 737–38 (2d Cir. 1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967); see *Coors v. United States*, 572 F.2d 826, 832 n.10 (Ct.Cl. 1978). These courts would reserve the term *sham* for a more narrow situation in which the transaction through which the taxpayer purportedly makes an interest payment is effected, for instance, solely through meaningless bookkeeping entries or fake transmissions of money and securities. The classic "Livingstone transaction" involved such a situation. *E. g., Dooley v. Commissioner*, 332 F.2d 463 (7th Cir. 1964); *Gheen v. Commissioner*, 331 F.2d 470 (6th Cir. 1964); *Nichols v. Commissioner*, 314 F.2d 337 (5th Cir. 1963); *Lynch v. Commissioner*, 273 F.2d 867 (2d Cir. 1959). *Goodstein v. Commissioner*, 267 F.2d 127 (1st Cir. 1959).[3]

Cases which have refrained from calling suspect transactions shams when the transactions involved more substance have developed other tests for determining deductibility of interest.[4] *Goldstein v. Commissioner*,

---

**2.** Of course, the court did not mean to say that a transaction is a sham merely because it is unprofitable.

**3.** For instance, in *Goodstein v. Commissioner*, 267 F.2d 127 (1st. Cir. 1959), the taxpayer agreed to purchase certain Treasury notes from Livingstone. The taxpayer then purportedly made a down payment on the notes. Livingstone arranged a loan for the balance. Livingstone then ordered a trust company to accept delivery of the notes from a bond dealer. The company accordingly credited the dealer's account and charged Livingstone's account with the purchase price. Yet, within one–half hour Livingstone resold the notes to the dealer who supposedly paid for them with his credit balance. Simultaneously, the taxpayer executed a note for the loan to cover the purchase price and pledged the notes as collateral. The supposed lender, a shell with no funds, then ordered Livingstone to sell the collateral. Of course, Livingstone had already done so by prearrangement, using the purported proceeds

to repay himself for the initial purchase. The taxpayer gave the lender checks for the payment of interest, but Livingstone also simultaneously lent the taxpayer the amount of that payment. Thus, the transaction created the appearance that the taxpayer incurred a large interest expense. However, the transaction completely lacked substance. The parties involved quickly found themselves in the same position they had occupied before the transaction began.

**4.** In distinguishing the traditional sham transaction from those more substantial, the Court in *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966) explained:

> Different considerations govern decision as to whether interest payments are deductible by a taxpayer who borrows money from an independent lending institution, executes a promissory note with recourse, and purchases Treasury obligations that are then in fact pledged with the lender as security for the

364 F.2d 734 (2d Cir. 1966), for example, involved a situation similar to that in *Bridges.* The taxpayer in *Goldstein* also was not granted an interest deduction, but the analysis of her transactions centered on whether those transactions involved purposive activity. The court in *Goldstein* held "that Section 163(a) of the 1954 Internal Revenue Code does not permit a deduction for interest paid or accrued in loan arrangements, like those now before us, that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." 364 F.2d at 740. It reasoned that any limit on the interest deduction had to

> stem from the Section's underlying notion that if an individual or corporation desires to engage in purposive activity, there is no reason why a taxpayer who borrows for that purpose should fare worse from an income tax standpoint than one who finances the venture with capital that otherwise would have been yielding income.

364 F.2d at 741. Therefore, to foster the financing of purposive activity through borrowing the court felt that:

> [S]ection 163(a) should be construed to permit the deductibility of interest when a taxpayer has borrowed funds and incurred an obligation to pay interest in order to engage in what with reason can be termed purposive activity, even though he decided to borrow in order to gain an interest deduction rather than to finance the activity in some other way. In other words, the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds; or, put a third way, the deduction is proper if there is some substance to the loan arrangement beyond

the taxpayer's desire to secure the deduction.

364 F.2d at 741. The converse of this principle is that Congress did not intend that a taxpayer could reduce his taxes with an interest deduction that arose from a transaction that had no substance, utility or purpose besides creation of the tax deduction.

The Court of Claims has further refined the purposive activity standard established by *Goldstein.* In *Rothschild v. United States,* 407 F.2d 404, 186 Ct.Cl. 709 (1969), describing a "business purpose test," it stated: "interest is not allowed to be deducted if no economic gain could be realized beyond a tax deduction." 407 F.2d at 406, 186 Ct.Cl. at 711.[5] In denying the deduction of interest paid pursuant to transactions also similar to those involved in *Bridges,* the court stated:

> It is difficult to arrive at an exact formula that will fit every case. But, regardless of the standard or combination of standards one might use, the taxpayer in the instant case has failed to show that he is entitled to the interest deduction. The transaction here could not appreciably affect his beneficial interest except to reduce his tax. There was no way he could have made a profit, except for the tax deduction. In fact, he does not contend otherwise. He was not subjected to a risk of loss other than the built–in loss that was a part of the transaction from the beginning. He meets none of the other tests suggested to sustain a proper interest deduction.

407 F.2d at 417, 186 Ct.Cl. at 722.[6]

The deductions taken by the taxpayer in the instant case are proper under the theories of any of the above cases. Even if the desire to receive an interest deduction played a part in the decision to finance the flower bonds through loans, that desire does

---

loan for a significant period of time, unless it can be concluded from other facts ... that the transaction is simply a sham.
364 F.2d at 738.

**5.** The Court of Claims provided an excellent discussion of prior cases involving analogous transactions.

**6.** Other cases have also used some of the same standards and language. *Allen H. Dahme Assoc. v. United States,* 436 F.2d 486, 193 Ct.Cl. 661 (1971); *Lifschultz v. Commissioner,* 393 F.2d 232 (2d Cir. 1968).

not control the deductibility of interest payments so long as the taxpayer acted through means which the law permits. *Knetsch v. United States*, 364 U.S. at 365, 81 S.Ct. at 134, 5 L.Ed.2d at 132; *Bridges v. Commissioner*, 325 F.2d at 183–84. A taxpayer may properly reduce his taxes through a legitimate and substantive transaction. *Rothschild v. United States*, 407 F.2d at 413, 186 Ct.Cl. at 718.

The transactions involved here were legitimate and substantive. Certain Treasury bonds issued prior to March 4, 1971, may be applied at par value to the payment of federal estate taxes although those bonds were purchased at a discount. Second Liberty Bond Act § 14, 31 U.S.C. § 765 (repealed 1971); Treas.Reg. § 20.6151–1(c) (1958); *see* 31 U.S.C. §§ 754b(b) & 757c–4. Consequently, these bonds are referred to as "flower bonds" since they blossom to par at the taxpayer's death. A common practice of older people or those in declining health who anticipate substantial estate tax liability is to purchase flower bonds to reduce that tax impact. *Estate of Pingree v. Blumenthal*, 78–1 U.S. Tax Cas. [CCH] ¶ 13,238 (D.Me. March 3, 1978); *accord, Estate of Stevenson v. Blumenthal*, 79–1 U.S. Tax Cas. [CCH] ¶ 13,285 (D.D.C. February 26, 1979). *See generally Estate of Watson v. Blumenthal*, 586 F.2d 925 (2d Cir. 1978). They are recognized as an effective and valid means of estate planning. Uri, *Flower Bonds Remain an Effective Simple Method to Cut Estate Taxes*, 52 J.Tax. 214 (1980); Brackney, *Post–Mortem Tax Planning for Estates*, 15 Wake Forest L.Rev. 581, 595–97 (1979). In fact, the Tax Court has recently allowed the deduction, as an estate administrative expense, of postmortem interest on a loan procured for the purchase of flower bonds. *Estate of Webster v. Commissioner*, 65 T.C. 968 (1976).

■ Wachovia, as Mrs. Sink's agent, purchased the flower bonds and borrowed funds to pay for them. Later, as trustee, Wachovia borrowed other funds to pay the principal and interest on the original loan and to continue financing of the purchase. Soon thereafter, $100,000 on the principal of this second loan was paid upon receipt of an installment on the New York Times note. These transactions created true indebtedness. Thus, the transactions undertaken by Wachovia on Mrs. Sink's behalf were not mere paper transactions without substance; they were not shams as that term is used in *Goodstein v. Commissioner*, 267 F.2d 127 (1st Cir. 1959) and its progeny.

Furthermore, under the terms of the transactions a "reasonable hope of the transaction[s] appreciably affecting the taxpayer's beneficial interest" existed apart from the income tax reduction. *Bridges v. Commissioner*, 325 F.2d at 184; *accord, Goldstein v. Commissioner*, 364 F.2d at 741. Mrs. Sink, after having purchased the flower bonds, was paying more in interest on loans than she received in interest from the bonds. The interest deduction helped to soften this financial squeeze. But at some point, the longer the taxpayer lived, the loss due to the differential in the bond and loan interest rates would have exceeded the savings which would flow from applying the bonds at par in payment of estate taxes. This is especially true because the bonds were includable at face value in the taxpayer's estate, thus increasing the amount of estate tax paid. However, the possibility of a substantial estate tax savings existed, assuming the taxpayer died within a certain period. Since she did die within that period, her financial interest was affected by more than just the interest deduction.

Conversely, the taxpayer also bore a risk of loss in that, if she continued to live long enough, the expenses of holding the flower bonds would have exceeded the ultimate estate tax savings. Although a risk of loss is not the only possible consideration, *Halle v. United States*, 346 F.2d 543, 548 (4th Cir. 1965), "if there is, under the realities of the terms of the transaction, some real risk of loss to the taxpayer, other than whatever loss might be actually 'built–in,' " the interest expense incurred is deductible. *Bridges v. Commissioner*, 325 F.2d at 185; *accord, Rothschild v. Commissioner*, 407 F.2d at 417, 186 Ct.Cl. at 722.

■ Because of the underlying motive, the taxpayer's transactions objectively appeared to have purpose, substance and utility apart from the interest deductions. *Goldstein v. Commissioner*, 364 F.2d at 740. The flower bond purchase with proceeds of the loans was purposive activity in that it was done to assist in the payment of estate taxes. This is not a situation where but for the interest deduction the taxpayer's agent under no circumstances would have procured the loan and purchased the bonds, *see Goldstein*, 364 F.2d at 742, although the deduction necessarily made the bond purchase more feasible. Congress intended to encourage the financing of purposive activity through borrowing. *Goldstein, supra* at 741.[7]

■ The IRS contends that since the benefit derived from the flower bonds was a tax savings, the interest incurred should not be deductible. It points out that in cases like *Bridges v. Commissioner*, 325 F.2d 180 and *Rothschild v. United States*, 407 F.2d 404, 186 Ct.Cl. 709, the questioned transactions involved a combination of tax savings—the interest deduction and long–term capital gain treatment. It feels that this case involves a similar combination. However, the Court disagrees with that analysis. First, the estate tax savings here did not result from a deduction or exclusion of income or estate assets from taxation. Rather, it flowed from a method of payment of estate taxes. Second, in those cases on which the IRS relies, the transactions could not possibly have resulted in a benefit to the taxpayer without the interest deduction regardless of capital gain treatment of the income generated. Here, the possibility of a benefit, although reduced, would have still existed without that deduction. Congress generally has not distinguished between different inducements for incurring interest expenses. *Cf. Commissioner v. Korell*, 339 U.S. 619, 628, 70 S.Ct. 905, 910, 94 L.Ed. 1108, 1114 (1950). So long as the inducement is not merely the interest de-

duction itself, the interest expense is deductible.

The legislative histories of Internal Revenue Code sections involving the interest deduction do not suggest otherwise. The history of section 163(a) reveals no Congressional intent to restrict the deduction. Unlike some other code provisions, *e. g.*, I.R.C. § 162, section 163(a) does not require that an interest expense serve a business purpose or be ordinary, necessary or even reasonable. *Goldstein v. Commissioner*, 364 F.2d at 741. Congress repeatedly rejected restrictions on section 23(b) of the 1939 Code, the predecessor of section 163(a). H.R. Conference Rep. No. 356, 69th Cong., 1st Sess. 34 (1926); H.R. Conference Rep. No. 844, 68th Cong., 1st Sess. 18 (1924). Thus, Congress evidently intended to restrict the interest deduction only as specified in I.R.C. §§ 163(d), 264 and 265.

Section 163(d) resulted from concern over use of the interest deduction for tax avoidance, but it merely sets an upper limit on the amount of investment interest which a taxpayer could deduct. H.R.Rep. No. 91–413 (Part I), 91st Cong., 1st Sess. 9 (1969), U.S.Code Cong. & Admin.News 1969, p. 1645. Section 264 prevents the deduction of expense incurred to purchase or carry a life insurance, endowment or annuity contract when the income from that contract is not taxable. Similarly, section 265(2) prohibits the deduction of "[i]nterest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from" the income tax. In this case, however, interest from the flower bonds was taxable income and the face value of the bonds was includable in the taxpayer's estate.

Based on the language of section 163(a) and the development of specific statutory restrictions on the deduction of interest expense, the Court concludes that Congress intended to otherwise allow deduction of interest incurred unless the transaction in-

---

**7.** The holding here is limited to the particular facts of this case. Certainly, interest expense incurred to purchase flower bonds generating a lower rate of return than the loan interest rate is not deductible if the taxpayer's age, health and financial situation demonstrate that payment of estate taxes was not the purpose of the purchase. The purpose here was undisputed.

volved is truly a sham or is entered into for no purpose other than to generate the interest deduction. This case, however, does not involve such a situation. Plaintiffs are entitled to summary judgment.[8]

IT IS THEREFORE ORDERED that defendant's motion for summary judgment be, and the same hereby is, DENIED and that plaintiffs' motion for summary judgment be, and the same hereby is, GRANTED.

8. Plaintiffs paid assessments in taxes and interest of $11,364.46, Stipulation ⁋ 13, and should recover that amount.